LYONDELL CHEMICAL COMPANY, Dan F. Smith, Carol A. Anderson, Susan K. Carter, Stephen I. Chazen, Travis Engen, Paul S. Halata, Danny W. Huff, David J. Lesar, David J.P. Meachin, Daniel J. Murphy And William R. Spivey, Defendants Below, Appellants,

v.

Walter E. RYAN, Jr., individually and on behalf of all others similarly situated, Plaintiff Below, Appellee.

No. 401, 2008.

Supreme Court of Delaware.

Submitted: Jan. 14, 2009.
Decided: March 25, 2009.
Revised: April 16, 2009.

Jesse A. Finkelstein, Esquire, Thomas A. Beck, Esquire, Daniel A. Dreisbach, Esquire (argued), Harry Tashjian, IV, Esquire, Blake Rohrbacher, Esquire, Meredith M. Stewart, Esquire, and David Schmerfeld, Esquire, of Richards, Layton and Finger, P.A., Wilmington, Delaware; Of Counsel: David D. Sterling, Esquire and Paul R. Elliott, Esquire of Baker Botts L.L.P., Houston, Texas for Appellants Dan F. Smith, Carol A. Anderson, Susan K. Carter, Stephen I. Chazen, Travis Engen, Paul S. Halata, Danny W. Huff, David J. Lesar, David J.P. Meachin, Daniel J. Murphy and William R. Spivey.

Edward P. Welch, Esquire, Edward B. Micheletti, Esquire, Jenness E. Parker, Esquire, Rachel J. Barnett, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware for Appellant Lyondell Chemical Company.

Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire (argued), A. Zachary Naylor, Esquire, Scott M. Tucker, Esquire, Tiffany J. Cramer, Esquire of Chimicles & Tikellis, LLP, Wilmington, Delaware; Of Counsel: Clinton A. Krislov, Esquire and Jeffrey M. Salas, Esquire of Krislov & Associates, Ltd., Chicago, Illinois for Appellee Walter E. Ryan, Jr.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

BERGER, Justice.

We accepted this interlocutory appeal to consider a claim that directors failed to act in good faith in conducting the sale of their company. The Court of Chancery decided that "unexplained inaction" permits a reasonable inference that the directors may have consciously disregarded their fiduciary duties. The trial court expressed concern about the speed with which the transaction was consummated; the directors' failure to negotiate better terms; and their failure to seek potentially superior deals. But the record establishes that the directors were disinterested and independent; that they were generally aware of the company's value and its prospects; and that they considered the offer, under the time constraints imposed by the buyer, with the assistance of financial and legal advisors. At most, this record creates a triable issue of fact on the question of whether the directors exercised due care. There is no evidence, however, from which to infer that the directors knowingly ignored their responsibilities, thereby breaching their duty of loyalty. Accordingly, the directors are entitled to the entry of summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Before the merger at issue, Lyondell Chemical Company ("Lyondell") was the third largest independent, publicly traded chemical company in North America. Dan Smith ("Smith") was Lyondell's Chairman and CEO. Lyondell's other ten directors were independent and many were, or had been, CEOs of other large, publicly traded companies. Basell AF ("Basell") is a privately held Luxembourg company owned by Leonard Blavatnik ("Blavatnik")

through his ownership of Access Industries. Basell is in the business of polyolefin technology, production and marketing.

In April 2006, Blavatnik told Smith that Basell was interested in acquiring Lyondell. A few months later, Basell sent a letter to Lyondell's board offering $26.50–$28.50 per share. Lyondell determined that the price was inadequate and that it was not interested in selling. During the next year, Lyondell prospered and no potential acquirors expressed interest in the company. In May 2007, an Access affiliate filed a Schedule 13D with the Securities and Exchange Commission disclosing its right to acquire an 8.3% block of Lyondell stock owned by Occidental Petroleum Corporation. The Schedule 13D also disclosed Blavatnik's interest in possible transactions with Lyondell.

In response to the Schedule 13D, the Lyondell board immediately convened a special meeting. The board recognized that the 13D signaled to the market that the company was "in play," [1] but the directors decided to take a "wait and see" approach. A few days later, Apollo Management, L.P. contacted Smith to suggest a management-led LBO, but Smith rejected that proposal. In late June 2007, Basell announced that it had entered into a $9.6 billion merger agreement with Huntsman Corporation ("Huntsman"), a specialty chemical company. Basell apparently reconsidered, however, after Hexion Specialty Chemicals, Inc. made a topping bid for Huntsman. Faced with competition for Huntsman, Blavatnik returned his attention to Lyondell.

On July 9, 2007, Blavatnik met with Smith to discuss an all-cash deal at $40 per share. Smith responded that $40 was too

---

1. On the day that the 13D was made public, Lyondell's stock went from $33 to $37 per share.

low, and Blavatnik raised his offer to $44–$45 per share. Smith told Blavatnik that he would present the proposal to the board, but that he thought the board would reject it. Smith advised Blavatnik to give Lyondell his best offer, since Lyondell really was not on the market. The meeting ended at that point, but Blavatnik asked Smith to call him later in the day. When Smith called, Blavatnik offered to pay $48 per share. Under Blavatnik's proposal, Basell would require no financing contingency, but Lyondell would have to agree to a $400 million break-up fee and sign a merger agreement by July 16, 2007.

Smith called a special meeting of the Lyondell board on July 10, 2007 to review and consider Basell's offer. The meeting lasted slightly less than one hour, during which time the board reviewed valuation material that had been prepared by Lyondell management for presentation at the regular board meeting, which was scheduled for the following day. The board also discussed the Basell offer, the status of the Huntsman merger, and the likelihood that another party might be interested in Lyondell. The board instructed Smith to obtain a written offer from Basell and more details about Basell's financing.

Blavatnik agreed to the board's request, but also made an additional demand. Basell had until July 11 to make a higher bid for Huntsman, so Blavatnik asked Smith to find out whether the Lyondell board would provide a firm indication of interest in his proposal by the end of that day. The Lyondell board met on July 11, again for less than one hour, to consider the Basell proposal and how it compared to the benefits of remaining independent. The board decided that it was interested, authorized the retention of Deutsche Bank

Securities, Inc. ("Deutsche Bank") as its financial advisor, and instructed Smith to negotiate with Blavatnik.

Basell then announced that it would not raise its offer for Huntsman, and Huntsman terminated the Basell merger agreement. From July 12–July 15 the parties negotiated the terms of a Lyondell merger agreement; Basell conducted due diligence; Deutsche Bank prepared a "fairness" opinion; and Lyondell conducted its regularly scheduled board meeting. The Lyondell board discussed the Basell proposal again on July 12, and later instructed Smith to try to negotiate better terms. Specifically, the board wanted a higher price, a go-shop provision [2], and a reduced break-up fee. As the trial court noted, Blavatnik was "incredulous." He had offered his best price, which was a substantial premium, and the deal had to be concluded on his schedule. As a sign of good faith, however, Blavatnik agreed to reduce the break-up fee from $400 million to $385 million.

On July 16, 2007, the board met to consider the Basell merger agreement. Lyondell's management, as well as its financial and legal advisers, presented reports analyzing the merits of the deal. The advisors explained that, notwithstanding the no-shop provision in the merger agreement, Lyondell would be able to consider any superior proposals that might be made because of the "fiduciary out" provision. In addition, Deutsche Bank reviewed valuation models derived from "bullish" and more conservative financial projections. Several of those valuations yielded a range that did not even reach $48 per share, and Deutsche Bank opined that the proposed merger price was fair.

2. A "go-shop" provision allows the seller to seek other buyers for a specified period after the agreement is signed.

Indeed, the bank's managing director described the merger price as "an absolute home run."[3] Deutsche Bank also identified other possible acquirors and explained why it believed no other entity would top Basell's offer. After considering the presentations, the Lyondell board voted to approve the merger and recommend it to the stockholders. At a special stockholders' meeting held on November 20, 2007, the merger was approved by more than 99% of the voted shares.

The first stockholders to litigate this merger filed suit in Texas on July 23, 2007. Walter E. Ryan, Jr., the plaintiff in this action, participated in the Texas litigation and filed suit in Delaware on August 20, 2007. The Texas court denied an application for a preliminary injunction on November 13, 2007, while the defendants in Delaware were briefing their motion for summary judgment. The Court of Chancery issued its opinion on July 29, 2008, denying summary judgment as to the "Revlon" and the "deal protection" claims. This Court accepted the Lyondell directors' application for certification of an interlocutory appeal on September 15, 2008.

## DISCUSSION

The class action complaint challenging this $13 billion cash merger alleges that the Lyondell directors breached their "fiduciary duties of care, loyalty and candor ... and ... put their personal interests ahead of the interests of the Lyondell shareholders."[4] Specifically, the complaint alleges that: 1) the merger price was grossly insufficient; 2) the directors

were motivated to approve the merger for their own self-interest;[5] 3) the process by which the merger was negotiated was flawed; 4) the directors agreed to unreasonable deal protection provisions; and 5) the preliminary proxy statement omitted numerous material facts. The trial court rejected all claims except those directed at the process by which the directors sold the company and the deal protection provisions in the merger agreement.

The remaining claims are but two aspects of a single claim, under *Revlon v. MacAndrews & Forbes Holdings, Inc.,*[6] that the directors failed to obtain the best available price in selling the company. As the trial court correctly noted, *Revlon* did not create any new fiduciary duties. It simply held that the "board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise."[7] The trial court reviewed the record, and found that Ryan might be able to prevail at trial on a claim that the Lyondell directors breached their duty of care. But Lyondell's charter includes an exculpatory provision, pursuant to 8 *Del. C.* § 102(b)(7), protecting the directors from personal liability for breaches of the duty of care. Thus, this case turns on whether any arguable shortcomings on the part of the Lyondell directors also implicate their duty of loyalty, a breach of which is not exculpated. Because the trial court determined that the board was independent and was not motivated by self-interest or ill will, the sole issue is whether the directors are entitled to summary judgment on the claim that

3. Appellants' Appendix, A–447.

4. Complaint, ¶ 109. A–184.

5. The directors' alleged financial interest is the fact that they would receive cash for their stock options.

6. 506 A.2d 173, 182 (Del.1986).

7. *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001).

they breached their duty of loyalty by failing to act in good faith.

This Court examined "good faith"[8] in two recent decisions. In *In re Walt Disney Co. Deriv. Litig.,*[9] the Court discussed the range of conduct that might be characterized as bad faith, and concluded that bad faith encompasses not only an intent to harm but also intentional dereliction of duty:

> [A]t least three different categories of fiduciary behavior are candidates for the "bad faith" pejorative label. The first category involves so-called "subjective bad faith," that is, fiduciary conduct motivated by an actual intent to do harm.... [S]uch conduct constitutes classic, quintessential bad faith....
>
> The second category of conduct, which is at the opposite end of the spectrum, involves lack of due care—that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent.... [W]e address the issue of whether gross negligence (including failure to inform one's self of available material facts), without more, can also constitute bad faith. The answer is clearly no.

\* \* \*

That leaves the third category of fiduciary conduct, which falls in between the first two categories.... This third category is what the Chancellor's definition of bad faith—intentional dereliction of

duty, a conscious disregard for one's responsibilities—is intended to capture. The question is whether such misconduct is properly treated as a non-exculpable, nonindemnifiable violation of the fiduciary duty to act in good faith. In our view, it must be....[10]

The *Disney* decision expressly disavowed any attempt to provide a comprehensive or exclusive definition of "bad faith."

A few months later, in *Stone v. Ritter,*[11] this Court addressed the concept of bad faith in the context of an "oversight" claim. We adopted the standard articulated ten years earlier, in *In re Caremark Int'l Deriv. Litig.:*[12]

> [W]here a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation ... only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.

The *Stone* Court explained that the *Caremark* standard is fully consistent with the *Disney* definition of bad faith. *Stone* also clarified any possible ambiguity about the directors' mental state, holding that "imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations."[13]

 The Court of Chancery recognized these legal principles, but it denied

---

8. Our corporate decisions tend to use the terms "bad faith" and "failure to act in good faith" interchangeably, although in a different context we noted that, "[t]he two concepts-bad faith and conduct not in good faith are not necessarily identical." 25 *Massachusetts Avenue Property LLC v. Liberty Property Limited Partnership,* Del.Supr., No. 188, 2008, Order at p. 5, (November 25, 2008). For purposes of this appeal, we draw no distinction between the terms.

9. 906 A.2d 27 (Del.2006).

10. *Id.* at 64–66.

11. 911 A.2d 362 (Del.2006).

12. 698 A.2d 959, 971 (Del.Ch.1996).

13. *Stone,* 911 A.2d at 370.

summary judgment in order to obtain a more complete record before deciding whether the directors had acted in bad faith.[14] Under other circumstances, deferring a decision to expand the record would be appropriate.[15] Here, however, the trial court reviewed the existing record under a mistaken view of the applicable law. Three factors contributed to that mistake. First, the trial court imposed *Revlon* duties on the Lyondell directors before they either had decided to sell, or before the sale had become inevitable. Second, the court read *Revlon* and its progeny as creating a set of requirements that must be satisfied during the sale process. Third, the trial court equated an arguably imperfect attempt to carry out Revlon duties with a knowing disregard of one's duties that constitutes bad faith.

◼ Summary judgment may be granted if there are no material issues of fact in dispute and the moving party is entitled to judgment as a matter of law. The facts, and all reasonable inferences, must be considered in the light most favorable to the non-moving party.[16] The Court of Chancery identified several undisputed facts that would support the entry of judgment in favor of the Lyondell directors: the directors were "active, sophisticated, and generally aware of the value of the Company and the conditions of the markets in which the Company operated."[17] They had reason to believe that no other bidders would emerge, given the price Basell had offered and the limited universe of companies that might be interested in ac-

quiring Lyondell's unique assets. Smith negotiated the price up from $40 to $48 per share—a price that Deutsche Bank opined was fair. Finally, no other acquiror expressed interest during the four months between the merger announcement and the stockholder vote.

Other facts, however, led the trial court to "question the adequacy of the Board's knowledge and efforts...."[18] After the Schedule 13D was filed in May, the directors apparently took no action to prepare for a possible acquisition proposal. The merger was negotiated and finalized in less than one week, during which time the directors met for a total of only seven hours to consider the matter. The directors did not seriously press Blavatnik for a better price, nor did they conduct even a limited market check. Moreover, although the deal protections were not unusual or preclusive, the trial court was troubled by "the Board's decision to grant considerable protection to a deal that may not have been adequately vetted under *Revlon*."[19]

The trial court found the directors' failure to act during the two months after the filing of the Basell Schedule 13D critical to its analysis of their good faith. The court pointedly referred to the directors' "two months of slothful indifference despite *knowing* that the Company was in play,"[20] and the fact that they "languidly awaited overtures from potential suitors...."[21] In the end, the trial court found that it was

14. Our standard of review is *de novo*. *Aero-Global Capital Management, LLC v. Cirrus Industries, Inc.*, 871 A.2d 428, 444 (Del.2005).

15. *Ibid.*

16. *Ibid.*

17. *Ryan v. Lyondell Chemical Co.*, 2008 WL 2923427 at *13 (Del.Ch.) (*Lyondell I*).

18. *Id.* at *14.

19. *Id.* at *17.

20. *Ibid.*

21. *Lyondell I* at *14.

this "failing" that warranted denial of their motion for summary judgment:

> [T]he Opinion clearly questions whether the Defendants "engaged" in the sale process. . . . This is where the 13D filing in May 2007 and the subsequent two months of (apparent) Board inactivity become critical. . . . [T]he Directors made *no apparent effort* to arm themselves with *specific knowledge* about the present value of the Company in the May through July 2007 time period, despite *admittedly knowing* that the 13D filing . . . effectively put the Company "in play," and, therefore, presumably, also knowing that an offer for the sale of the Company could occur at any time. It is these facts that raise the specter of "bad faith" in the present summary judgment record. . . . [22]

■■ The problem with the trial court's analysis is that *Revlon* duties do not arise simply because a company is "in play." [23] The duty to seek the best available price applies only when a company embarks on a transaction—on its own initiative or in response to an unsolicited offer—that will result in a change of control. [24] Basell's Schedule 13D did put the Lyondell directors, and the market in general, on notice that Basell was interested in acquiring Lyondell. The directors responded by promptly holding a special meeting to consider whether Lyondell should take any action. The directors decided that they would neither put the company up for sale nor institute defensive measures to fend off a possible hostile offer. Instead, they decided to take a "wait and see" approach. That decision was an entirely appropriate exercise of the directors' business judgment. The time for action under *Revlon* did not begin until July 10, 2007, when the directors began negotiating the sale of Lyondell.

The Court of Chancery focused on the directors' two months of inaction, when it should have focused on the one week during which they considered Basell's offer. During that one week, the directors met several times; their CEO tried to negotiate better terms; they evaluated Lyondell's value, the price offered and the likelihood of obtaining a better price; and then the directors approved the merger. The trial court acknowledged that the directors' conduct during those seven days might not demonstrate anything more than lack of due care. [25] But the court remained skeptical about the directors' good faith—at least on the present record. That lingering concern was based on the trial court's synthesis of the *Revlon* line of cases, which led it to the erroneous conclusion that directors must follow one of several courses of action to satisfy their *Revlon* duties.

■■ There is only one *Revlon* duty—to "[get] the best price for the stockholders at a sale of the company." [26] No court can tell directors exactly how to accomplish that goal, because they will be facing a unique combination of circumstances, many of which will be outside their control. As we noted in *Barkan v. Amsted Industries, Inc.,* "there is no single blueprint that a board must follow to fulfill its

---

**22.** *Ryan v. Lyondell Chemical Co.,* 2008 WL 4174038 at *2 (Del.Ch.) (*Lyondell II* ).

**23.** *Paramount Communications, Inc. v. Time, Inc.,* 571 A.2d 1140, 1151 (Del.1989).

**24.** *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 71 (1995).

**25.** *Lyondell II* at *4.

**26.** *Revlon,* 506 A.2d at 182.

duties."[27] That said, our courts have highlighted both the positive and negative aspects of various boards' conduct under Revlon.[28] The trial court drew several principles from those cases: directors must "engage actively in the sale process,"[29] and they must confirm that they have obtained the best available price either by conducting an auction, by conducting a market check, or by demonstrating "an impeccable knowledge of the market."[30]

The Lyondell directors did not conduct an auction or a market check, and they did not satisfy the trial court that they had the "impeccable" market knowledge that the court believed was necessary to excuse their failure to pursue one of the first two alternatives. As a result, the Court of Chancery was unable to conclude that the directors had met their burden under *Revlon*. In evaluating the totality of the circumstances, even on this limited record, we would be inclined to hold otherwise. But we would not question the trial court's decision to seek additional evidence if the issue were whether the directors had exercised due care. Where, as here, the issue is whether the directors failed to act in good faith, the analysis is very different, and the existing record mandates the entry of judgment in favor of the directors.

█ As discussed above, bad faith will be found if a "fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."[31] The trial court decided that the *Revlon* sale process must follow one of three courses, and that the Lyondell directors did not discharge that "known set of [*Revlon*] 'duties'."[32] But, as noted, there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties. Thus, the directors' failure to take any specific steps during the sale process could not have demonstrated a conscious disregard of their duties. More importantly, there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties.

 Directors' decisions must be reasonable, not perfect.[33] "In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."[34] The trial court denied summary judgment because the Lyondell directors' "unexplained inaction" prevented the court from determining that they had acted in good faith.[35] But, if the directors failed to do all that they should have under the circumstances, they breached their duty of care. Only if they knowingly and

---

27. 567 A.2d 1279, 1286 (Del.1989).

28. *See, e.g.: Barkan v. Amsted Industries, Inc.,* 567 A.2d at 1287 (Directors need not conduct a market check if they have reliable basis for belief that price offered is best possible.); *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 49 (Del.1994) (No-shop provision impermissibly interfered with directors' ability to negotiate with another known bidder); *In re Netsmart Technologies, Inc., Shareholders Litig.,* 924 A.2d 171, 199 (Del.Ch.2007) (Plaintiff likely to succeed on claim based on board's failure to consider strategic buyers.)

29. *Lyondell I* at *12.

30. *Id.* at *19.

31. *Disney* at 67.

32. *Lyondell I* at *19.

33. *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d at 45.

34. *In re Lear Corp. S'holder Litig.,* 2008 WL 4053221 at *11 (Del.Ch.).

35. *Lyondell II* at *5.

completely failed to undertake their responsibilities would they breach their duty of loyalty. The trial court approached the record from the wrong perspective. Instead of questioning whether disinterested, independent directors did everything that they (arguably) should have done to obtain the best sale price, the inquiry should have been whether those directors utterly failed to attempt to obtain the best sale price.[36]

Viewing the record in this manner leads to only one possible conclusion. The Lyondell directors met several times to consider Basell's premium offer. They were generally aware of the value of their company and they knew the chemical company market. The directors solicited and followed the advice of their financial and legal advisors. They attempted to negotiate a higher offer even though all the evidence indicates that Basell had offered a "blowout" price.[37] Finally, they approved the merger agreement, because "it was simply too good not to pass along [to the stockholders] for their consideration."[38] We assume, as we must on summary judgment, that the Lyondell directors did absolutely nothing to prepare for Basell's offer, and that they did not even consider conducting a market check before agreeing to the merger. Even so, this record clearly establishes that the Lyondell directors did not breach their duty of loyalty by failing to act in good faith. In concluding otherwise, the Court of Chancery reversibly erred.

## CONCLUSION

Based on the foregoing, the decision of the Court of Chancery is reversed and this matter is remanded for entry of judgment in favor of the Lyondell directors. Jurisdiction is not retained.

---

**36.** *See Stone* at 369.

**37.** *Lyondell I* at *1. The trial court disparages the Lyondell directors' characterization of $48 per share as a "blowout" premium. But the record evidence—including testimony from Basell directors who voted against the merger because they believed the price was too high—supports such a description.

