# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD B. GAMBERG 2007 FAMILY TRUST, on behalf of itself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 10994-VCMR |
| UNITED RESTAURANT GROUP, L.P., a Delaware limited partnership, ATLANTIC COAST DINING, INC., a Delaware corporation, ANTHONY GRILLO, ROBERT APPLEBY, DAVIS H. WOOD and LINWOOD R. MILLER, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 3, 2017
Date Decided: January 26, 2018

Eric M. Andersen, ANDERSEN SLEATER SIANNI LLC, Wilmington, Delaware; *Attorney for Plaintiff.*

Rebecca L. Butcher, Joseph D. Wright, and Travis J. Ferguson, LANDIS RATH & COBB LLP, Wilmington, Delaware; *Attorneys for Defendants Atlantic Coast Dining, Inc., Anthony Grillo, Robert Appleby, Davis H. Wood, and Linwood R. Miller.*

Frank E. Noyes, OFFIT KURMAN, P.A., Wilmington, Delaware; Joyce A. Kuhns, OFFIT KURMAN, P.A., Baltimore, Maryland; *Attorneys for Defendant United Restaurant Group, L.P.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case involves the right to distributions under a partnership agreement. At the time of partnership formation, the express terms of the partnership agreement required that any excess distributions in a given year be treated as prepayment in later years. Three years later, William H. Vaughn took over as president of the general partner, and for more than a decade the partnership made excess distributions without accounting for the overpayments as prepayments.

Following Vaughn's death in 2009, ownership of the general partner passed to new individuals. In response to the partnership's struggles during the financial crisis, the general partner sought to refinance certain debt obligations in order to avoid insolvency and liquidation. During the lead-up to the refinancing, the general partner realized that the partnership had previously made excess distributions during Vaughn's tenure that had not been treated as prepayments. Consistent with the plain language of the partnership agreement, the general partner reclassified the prior excess distributions as prepayments, so that the limited partners were not due any cash in connection with the refinancing. Additionally, the refinancing would cause the owners of the general partner to incur personal tax liability. Thus, the general partner proposed an amendment that would allow the partnership to use a portion of the proceeds to cover the tax liability for the owners of the general partner, which a majority of the limited partners approved.

1

Plaintiff objected to the reclassification of the overpayments as prepayments and to the amendment to the partnership agreement. Thereafter, Plaintiff filed this action. Plaintiff alleges that the prepayment terms of the partnership agreement do not reflect the actual intent of the original agreement between the general partner and limited partner. One person executed the agreement as both the sole limited partner and president of the general partner. As the focus of its claims, Plaintiff seeks reformation of the partnership agreement on a theory of mutual or unilateral mistake with oneself by scrivener's error. Plaintiff contends that Defendants violated the reformed terms of the partnership agreement by failing to pay a portion of the refinancing proceeds to the limited partners (the "Limited Partners"). Defendants moved to dismiss or, in the alternative, for summary judgment, which the parties fully briefed. Thereafter, Plaintiff moved to amend its complaint (the "Complaint"). For the reasons detailed below, I deny Plaintiff's Motion to Amend and grant Defendants' Motion to Dismiss.

## I. BACKGROUND

All facts derive from the Complaint and the documents incorporated by reference therein.[1]

---

[1] On a motion to dismiss, the Court may consider documents outside the pleadings if "(1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents." *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

## A. Parties

United Restaurant Group L.P. (the "Partnership") owns franchise rights for twenty-nine T.G.I. Friday's restaurants.[2] Atlantic Coast Dining, Inc. (the "General Partner") is organized as a subchapter S Delaware corporation and serves as general partner.[3] Anthony Grillo, Robert Appleby, Davis H. Wood, and Linwood R. Miller (the "Individual Defendants," collectively with the Partnership and the General Partner, the "Defendants") are the directors and owners of the General Partner.[4] Grillo serves as president and CEO of the General Partner.[5] Plaintiff Richard B. Gamberg 2007 Family Trust is a Limited Partner. Vaughn established Plaintiff in 2007 to hold a portion of his Limited Partner units, and Vaughn's ownership interest in the General Partner passed to his estate in 2009 upon his death.[6]

## B. The Partnership Agreement

A partnership agreement (the "Agreement") governs the relationship between the General Partner and the Partnership's Limited Partners.[7] The

---

[2]     Compl. ¶ 4.

[3]     *Id.* ¶ 11.

[4]     *Id.* ¶¶ 12-15.

[5]     *Id.* ¶ 11.

[6]     *Id.* ¶ 17.

[7]     *Id.* at Ex. A.

Agreement governs distributions of net cash flow as well as net sale and refinancing proceeds.[8] As the Agreement currently reads, the General Partner calculates distributions of net cash flow to Limited Partners on a cumulative basis.[9] The relevant provision—Section 6.1(c)(1)—states:

> [Each calendar quarter Unit Holders are entitled to a distribution of Net Cash Flow] in an amount equal to the excess, if any, of (i) the aggregate, cumulative Priority Returns from the date the First New Restaurant opens for business to the [present], *over* (ii) the *sum of all prior distributions* to such Unit Holders pursuant to this Paragraph (1), Paragraph 3 of this Subsection (c) and Sections 6.2 (b) and (d) hereof [governing distributions of net sales and refinancing proceeds].[10]

"In other words, if the Limited Partners have received distributions in excess of [what they are owed] in a given year, these excess distributions are treated as prepayment of [distributions] in future years."[11] Plaintiff contends this prepayment mechanism is a scrivener's error.[12]

Additionally, Section 5.1(a) allocates profits of the Partnership. Section 5.1(a)(5) allocates profits to the Limited Partners on a cumulative basis:

---

[8] *Id.* at Ex. A, §§ 6.1, 6.2.

[9] *Id.* ¶ 21.

[10] *Id.* at Ex. A, § 6.1(c)(1) (emphasis added).

[11] *Id.*

[12] *Id.* ¶ 22.

4

[Profits shall be allocated] . . . to the Unit Holders, other than the General Partner . . . in an amount equal to the excess, if any, of (i) the sum of (A) the aggregate, cumulative Priority Returns from the date the First New Restaurant opens for business to the [present], and (B) the cumulative Losses allocated pursuant to Subsection (b)(3) of this Section 5.1 for all prior Fiscal Years, *over* (ii) the *cumulative* Profits allocated pursuant to this Paragraph (5) for all prior Fiscal Years.[13]

After the Partnership allocates the profits due to the Limited Partners, Section 5.1(a)(6) allocates profits to the General Partner:

[Profits shall be allocated] . . . to the General Partner, in an amount equal to the excess, if any, of (i) the sum of (A) the cumulative (but not compounded) Subordinated Allowance from the date the First New Restaurant opens for business to the [present], and (B) the cumulative Losses allocated pursuant to Subsection (b)(2) of this Section 5.1 for all prior Fiscal Years, over (ii) the cumulative Profits allocated pursuant to this Paragraph (6) for all prior Fiscal Years.[14]

## C. Relevant Facts

At the inception of the Partnership in 1993, Robert H. Snyder was the president of the General Partner, the sole Limited Partner, and the sole signatory to the Agreement in both capacities.[15] Additional investors joined at later dates after execution of the Agreement. Vaughn, Snyder's father-in-law, served as the

---

[13]     *Id.* at Ex. A, § 5.1(a)(5) (emphasis added).

[14]     *Id.* at Ex. A, § 5.1(a)(6) (emphasis added).

[15]     *Id.* at Ex. A, at 81.

5

president of the General Partner from 1996 to 2009.[16] During that time, Vaughn and the General Partner's board of directors allegedly oversaw distributions without accounting for distributions in prior years, despite the requirements of the Agreement.[17] Then, the Partnership encountered financial difficulties in 2009 and 2010.[18] In 2013, the General Partner began to consider a variety of strategic options,[19] including refinancing the Partnership's debt.[20] During this strategic review, the General Partner realized that Vaughn had made certain payments in violation of the terms of the Agreement.[21] Because of the failure to properly account for excess distributions as overpayments, the General Partner determined

---

[16] *Id.* ¶ 17.

[17] *Id.* ¶ 23; Pl.'s Opp'n Br. to Mot. to Dismiss 4.

[18] *See, e.g.*, Compl. Ex. G, at 1 ("[I]n the fourth quarter of 2009, [the Partnership] was in violation of [certain] loan covenants, and by the end of 2010, we were in default which could have resulted in foreclosure of all of our assets and the liquidation of the company if it had not been resolved. Due to the successful refinancing of [certain] debt with GE and Medley, we were able to continue operating and have stabilized [the Partnership's] financial performance. The Medley debt was critical to . . . survival, but came at a price.").

[19] Plaintiff notes that the General Partner employed Grillo starting in 1995. Pl.'s Opp'n Br. to Mot. to Dismiss 14. But Plaintiff does not explain when Appleby, Wood, and Miller joined the General Partner.

[20] Compl. ¶ 17.

[21] *Id.* at Ex. G, at 2.

that Limited Partners would receive less from any distributions until the earlier overpayments were recouped through what would otherwise be underpayments.[22]

The General Partner chose to refinance with GE Capital (the "GE Transaction"), which generated a taxable gain of $4.3 million[23] and a $1.4 million tax liability.[24] Before refinancing, the General Partner explained that the gain—and thus the tax liability—would fall on the General Partner under the Agreement because the Limited Partners had effectively been prepayed.[25] In order to make the refinancing agreeable to the General Partner from a tax liability standpoint, the Partnership considered a fifth amendment to the Agreement (the "Fifth Amendment") that would allow a tax distribution to the General Partner to cover such a tax payment shortfall.[26] Plaintiff declined to approve the Fifth Amendment.[27] After obtaining the approval of a majority of the Limited Partners,

---

[22]     *Id.* ¶ 3.

[23]     *Id.* ¶ 17.

[24]     *Id.* at Ex. H, at 2.

[25]     *Id.*

[26]     Defs.' Opening Br. to Mot. to Dismiss Ex. 1.

[27]     Pl.'s Opp'n Br. to Mot. to Dismiss 14.

the General Partner deemed the Fifth Amendment approved on October 31, 2013,[28] and completed the refinancing transaction.[29]

## II. MOTION TO AMEND ANALYSIS

Plaintiff seeks to amend its Complaint under Court of Chancery Rule 15(aaa). Plaintiff submitted its first amended Complaint on September 14, 2015. On October 15, 2015, Defendants filed a Motion to Dismiss. On November 20, 2015, Plaintiff filed a brief in opposition to the Motion to Dismiss. On December 4, 2015, Defendants filed a reply brief. On February 2, 2016, the parties proposed settlement terms in a memorandum of understanding, but discussions broke down before actual settlement resulted. On May 12, 2016, Plaintiff submitted a Motion to Amend the Complaint for a second time based on pre-existing information learned during settlement talks. Plaintiff asks to add the Partnership's auditor as a defendant and bring a new claim for tortious interference with a contract—the Agreement—against the auditor.[30]

Rule 15(aaa) states that:

> [A] party that wishes to respond to a motion to dismiss under Rules 12(b)(6) or 23.1 by amending its pleadings must file an amended complaint, or a motion to amend in conformity with this Rule, no later than the time such

---

[28]    Defs.' Opening Br. to Mot. to Dismiss Ex. 1.

[29]    Compl. ¶ 38.

[30]    Mot. for Leave to File Second Am. Compl.

8

party's answering brief in response to either of the foregoing motions is due to be filed.[31]

"Rule 15(aaa) does not contemplate the possibility of filing a motion to amend after the responsive brief is filed and before a decision by the court dismissing the complaint."[32]   Thus, the general rule is that a plaintiff may not amend the complaint after filing the answering brief to a motion to dismiss. Plaintiff points to *Lenois v. Lawal*[33] and *Fortis Advisors, LLC v. Shire US Holdings, Inc.*[34] as departures from that general rule; but, in each of those instances truly unique, new information came to light that each plaintiff could not have otherwise known earlier, and principles of equity favored allowing amendment. This is not the case here, and justice does not dictate another result.  Thus, I deny Plaintiff's Motion to Amend and evaluate Defendants' Motion to Dismiss against the existing Complaint.

## III.   MOTION TO DISMISS ANALYSIS

Defendants move to dismiss under Court of Chancery Rule 12(b)(6).  In considering a motion to dismiss under Rule 12(b)(6), "(i) all well-pleaded factual

---

[31]   Ct. Ch. R. 15(aaa).

[32]   *Stern v. LF Capital P'rs, LLC*, 820 A.2d 1143, 1146 (Del. Ch. 2003).

[33]   Order Granting Pl.'s Mot. for Leave to Supplement the Compl., *Lenois v. Lawal*, C.A. No. 11963-VCMR (Del. Ch. May 23, 2017).

[34]   C.A. No. 12147-VCS (Del. Ch. Oct. 24, 2016) (TRANSCRIPT).

9

allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; [and] (iii) the Court must draw all reasonable inferences in favor of the non-moving party."[35] While I must draw all reasonable inferences in Plaintiff's favor, I need not "accept as true conclusory allegations 'without specific supporting factual allegations.'"[36] "[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[37]

The Complaint asserts five counts: (1) a claim for reformation of the Agreement; (2) a breach of contract claim against the General Partner for enacting the Fifth Amendment without unanimous approval from the Limited Partners; (3) a breach of contract claim against the General Partner seeking a cash distribution from the Partnership; (4) a breach of contract claim against the General Partner alleging the Partnership improperly advanced fees; and (5) a breach of fiduciary duty claim against the Individual Defendants for a disclosure allegedly made in bad faith before the vote on the Fifth Amendment. I address each in turn. At the

---

[35] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[36] *Id.* (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65-66 (Del. 1995)).

[37] *Id.* (quoting *Savor*, 812 A.2d at 896-97).

10

outset, I note that Plaintiff chose very specific arguments on which to stand.[38]  I address only these arguments, and all other "[i]ssues not briefed are deemed waived."[39]

## A. The Court Grants the Motion to Dismiss with Respect to the Contractual Claims

This action requires me to examine the Agreement between and among the General Partner and Limited Partners.[40]  "Delaware law adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[41]  "When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[42]  The terms of the contract control "when they establish the parties' common meaning so that a reasonable person in the position

---

[38] Other arguments may have been available to Plaintiff, *e.g.* contract modification by conduct, but Plaintiff does not assert any other arguments than those addressed by this Memorandum Opinion.

[39] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 140 n.3 (Del. 1997); *Murphy v. State*, 632 A.2d 1150, 1152 (Del. 1993)).

[40] *Arvida/JMB P'rs, L.P. v. Vanderbilt Income and Growth Assocs.*, 1997 WL 294440, at *2 (Del. Ch. May 23, 1997) ("[T]he controlling agreements must be interpreted in accordance with the rules for construing contracts.").

[41] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[42] *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

of either party would have no expectations inconsistent with the contract language."[43]  Standard rules of contract interpretation state that "a court must determine the intent of the parties from the language of the contract."[44]

### 1.    Plaintiff fails to state a claim for reformation

Plaintiff asks the Court to reform the Agreement based on mutual or unilateral mistake with oneself by scrivener's error.[45]  To obtain reformation of a contract, a plaintiff must show:

> [A]n agreement has been made, or a transaction has been entered into or determined upon, as intended by all parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction.[46]

---

[43]    *Id.* at 368 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[44]    *Id.* (quoting *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003)).

[45]    Compl. ¶¶ 22, 57.

[46]    *Lions Gate Ent. Corp. v. Image Ent. Inc.*, 2006 WL 1668051, at *8 (Del. Ch. June 5, 2006) (citing *Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del. 1990)).  "A party seeking reformation must establish the need for the remedy by clear and convincing evidence."  *Id.* (citing *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *15 (Del. Ch. July 6, 2004)).

12

One way that a written instrument may fail to reflect the "real agreement"[47] of the parties is the presence of a scrivener's error. A scrivener's error occurs where the written instrument "fails to reflect the intention of the parties"[48] through "the mistake of the scrivener who drew the contract for the parties."[49]

The relevant language of the Agreement appears in Section 6.1(c)(1)—governing distribution of net cash flow—and states:

> [Each calendar quarter Unit Holders are entitled to a distribution of Net Cash Flow] in an amount equal to the excess, if any, of (i) the aggregate, cumulative Priority Returns from the date the First New Restaurant opens for business to the [present], *over* (ii) the *sum of all prior distributions* to such Unit Holders pursuant to this Paragraph (1), Paragraph 3 of this Subsection (c) and Sections 6.2 (b) and (d) hereof [governing distributions of net sales and refinancing proceeds].[50]

Thus, the Agreement treats any overpayments under the applicable sections as prepayments that reduce future distributions.

---

[47] *Id.*

[48] *Deutsche Bank Nat'l Tr. Co. v. Roslewicz*, 2014 WL 4559101, at *3 (Del. Ch. Sept. 2, 2014) (citing 66 Am. Jur. 2d. *Reformation of Instruments* § 19 (2014)).

[49] 66 Am. Jur. 2d. *Reformation of Instruments* § 19. "An example of a scrivener's error is a 'minor typographical mistake, such as an incorrect address.'" *Deutsche Bank*, 2014 WL 4559101, at *3 (quoting *Envo, Inc., v. Walters*, 2009 WL 5173807, at *5 (Del. Ch. Dec. 30, 2009)). But a scrivener's error may also be more substantive. *See, e.g.*, *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 2012 WL 1869416, at *1 (Del. Ch. May 16, 2012) (reforming a waterfall provision).

[50] Compl. Ex. A, § 6.1(c)(1) (emphasis added).

13

Plaintiff alleges that the scrivener of the Agreement made a mistake by including the prepayment mechanism. Plaintiff begins by explaining that "Snyder was the sole signatory to the . . . Agreement signing in his capacity as the General Partner and the initial Limited Partner," so Snyder was the individual on both sides of the alleged mistake.[51] "Snyder [states that he] did not know or realize the offending provision [providing for prepayment] was included in the . . . Agreement."[52] And, thus, the mistake—whether mutual or unilateral—occurred because of "a scrivener's error."[53]

Plaintiff offers two facts as support that the prepayment mechanism is a scrivener's error.[54] First, Plaintiff argues that Vaughn made certain distributions to the Limited Partners without accounting for prior overpayments.[55] But Plaintiff

---

[51] *Id.* ¶ 57.

[52] *Id.* ¶ 58.

[53] Pl.'s Opp'n Br. to Mot. to Dismiss 8.

[54] Plaintiff also attempts to create ambiguity in the Agreement by noting that the Agreement excludes net sales and refinancing proceeds from the definition of net cash flow. *Id.* at 8-9. This argument, however, does not create an ambiguity. Net cash flow does indeed exclude net sales and refinancing proceeds. Compl. Ex. A, § 1.1(aa). But Section 6.1(c) of the Agreement does not distribute net sales and refinancing proceeds; instead, Section 6.2 of the Agreement does. *Id.* at Ex. A, §§ 6.1(c), 6.2. Section 6.1(c) then explicitly reduces the amounts distributed under this provision by the amounts already distributed under Section 6.2. *Id.* at Ex. A, § 6.1(c). There is no ambiguity or scrivener's error with this; the Agreement functions precisely as Defendants explain.

[55] Pl.'s Opp'n Br. to Mot. to Dismiss 8.

14

does not explain how or why Vaughn's failure to treat the overpayments as prepayments evidences a mistake in the Agreement. And Plaintiff does not contest that the literal terms of the Agreement dictate that Vaughn's overpayments operate as prepayment, exactly how Defendants treated them.

Second, Plaintiff notes that Snyder signed a verification, submitted with the Complaint, that he believes that the Complaint is "true and correct."[56] Presumably, this statement extends to Plaintiff's argument that the prepayment mechanism is a mistake by scrivener's error. But Plaintiff does not attempt to offer Snyder's understanding of what error the scrivener made in drafting the language of the agreement or what the correct language should be. And while Snyder was the sole Limited Partner and president of the General Partner at the time of Partnership formation, to the extent Snyder's verification may be viewed as approval of Plaintiff's allegations, Plaintiff only alleges what Snyder believed the underlying agreement *was not*, as opposed to what positive agreement Snyder intended to govern distributions.

Moreover, the prepayment mechanism contained in Section 6.1(c)(1), which is carefully crafted and clear on its face, occurs in three other distribution provisions in the Agreement.[57] Plaintiff does not address these identical

---

[56] Verification of Robert H. Snyder.

[57] Compl. Ex. A, §§ 6.1(c)(2), 6.2(b), 6.2(c).

15

distribution provisions. Even if I were to reform the prepayment mechanism contained in Section 6.1(c)(1), I would be left to guess whether I should alter one or more of the other provisions providing for prepayment of various distributions, and indeed which provisions to alter or leave alone.

In sum, Plaintiff does not identify what error was made when "reducing [the] agreement . . . to writing."[58] Plaintiff does not explain "exactly what terms [the Court should] insert into the contract."[59] Nor does Plaintiff offer any facts or arguments to explain what "specific prior contractual understanding"[60] should govern the interactions between the General Partner and Limited Partners. All that Plaintiff states is what the terms of the Agreement *are not*, but Plaintiff does not offer any explanation for what the terms of the Agreement should be. The Court is left to guess what contractual terms should fill the void. Plaintiff fails to meet its pleading burden to state a reasonably conceivable claim for reformation of the Agreement. Thus, I dismiss Plaintiff's claim for reformation of an alleged scrivener's error in the contract.

---

[58] *Lions Gate*, 2006 WL 1668051, at *8 (Del. Ch. June 5, 2006) (citing *Waggoner*, 581 A.2d at 1135).

[59] *ASB Allegiance*, 2012 WL 1869416, at *13 (quoting *Collins v. Burke*, 418 A.2d 999, 1002 (Del. 1980)).

[60] *Id.*

16

### 2. Plaintiff fails to state a claim for breach of the implied covenant of good faith and fair dealing

In the alternative, Plaintiff argues that Defendants breached the implied covenant of good faith and fair dealing.[61]  But that "doctrine . . . operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer."[62]  "The implied covenant is well-suited to imply contractual terms that are so obvious—like a requirement that the general partner not engage in misleading or deceptive conduct to obtain safe harbor approvals— that the drafter would not have needed to include the conditions as express terms in the agreement."[63]  Here, the Agreement speaks directly, and it dictates the opposite result from that which Plaintiff seeks.  The Agreement treats overpayment of distributions in any given year as prepayment for future years.[64]  Further, "Delaware law 'will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably

---

[61]    Compl. ¶ 59; Pl.'s Opp'n Br. to Mot. to Dismiss 18-20.

[62]    *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1018 (Del. Ch. 2010) (quoting *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009)).

[63]    *Dieckman v. Regency GP LP*, 155 A.3d 358, 361 (Del. 2017).

[64]    Compl. Ex. A, § 6.1.

expected.'"[65]    Plaintiff does not explain how Defendants acted unreasonably; rather, Defendants follow the express terms of the Agreement to grant Plaintiff the fruits of his bargain, namely that overpayments in one year constitute prepayments for later years.

Thus, Plaintiff fails to state a claim for breach of the implied covenant of good faith and fair dealing.

### 3.    Plaintiff fails to state a claim that the Fifth Amendment violated the Agreement

Plaintiff asserts that the General Partner breached the Agreement by failing to receive unanimous approval for the Fifth Amendment.[66]   Section 12.3(c) of the Agreement states that "no amendment to this Agreement shall . . . change the liability of or reduce the interests of the General Partner or the Limited Partners in Partnership capital, Profits or Losses . . . unless all Partners consent in writing prior to such amendment."[67]   The Fifth Amendment contains a provision stating that "[t]o the extent consistent with the [Internal Revenue] Code, all gain from the sale of assets in connection with the GE Transaction shall be allocated to the General

---

[65]    *Lonergan*, 5 A.3d at 1018 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010)).

[66]    Compl. ¶¶ 62-64.

[67]    *Id.* at Ex. A, § 12.3(c).

18

Partner under Section 5.1(a)(6) of the . . . Agreement."[68]  Plaintiff contends that this paragraph necessitates unanimous approval because it directly alters the allocation of gain under the Agreement[69] and "overrides the order and priority of the allocation of gains [by] jumping over" the Limited Partners.[70]  Plaintiff seeks rescission of the Fifth Amendment.[71]

On its face, the Fifth Amendment does not change the allocation of gains under the Agreement.  Instead, the Fifth Amendment states that gains "shall be allocated . . . under Section 5.1(a)(6) of the . . . Agreement."[72]  Noting that an action will be taken *in compliance with* the existing contract does not modify that contract.  Plaintiff's theory that the Fifth Amendment alters the allocation of gains by leapfrogging the Limited Partners only succeeds if the Court reforms the Agreement consistent with Plaintiff's request as discussed above.  Otherwise, the Agreement does not entitle the Limited Partners to proceeds from the GE Transaction because the Limited Partners have been prepaid for those proceeds,[73]

---

[68]    Defs.' Opening Br. to Mot. to Dismiss Ex. 1, § 2.

[69]    Compl. ¶ 64.

[70]    Pl.'s Opp'n Br. to Mot. to Dismiss 21-22.

[71]    Compl. ¶ 67.

[72]    Defs.' Opening Br. to Mot. to Dismiss Ex. 1, § 2.

[73]    Plaintiff does not contest that the Vaughn overpayments, if treated as prepayments under the Agreement, reduce the amount due to the Limited Partners from the GE

19

and all proceeds from the GE Transaction flow to the General Partner under Section 5.1(a)(6) of the Agreement. As discussed *supra*, Plaintiff has not adequately stated a claim for reformation. Thus, the General Partner did not need unanimous approval for the Fifth Amendment, and the count fails.

Plaintiff also seeks a cash distribution because the "invalid and unenforceable . . . Fifth Amendment" barred a legitimate distribution to the Limited Partners.[74] But Plaintiff fails to sufficiently plead that the General Partner did not validly enact the Fifth Amendment. Thus, this count also fails.

### 4. Plaintiff fails to state a claim that the Agreement precludes the advancement of fees

Plaintiff avers that the General Partner violated the Agreement by improperly advancing legal fees to Defendants in this action.[75] Section 8.4 of the Agreement provides that "attorneys' fees may be paid as incurred."[76] This

---

Transaction to zero, so that all proceeds from the GE Transaction flow to the General Partner. Defendants filed an exhibit with the Motion to Dismiss which shows that treating the Vaughn overpayments as prepayments implies that the Limited Partners were not entitled to any proceeds from the GE Transaction. *Id.* at Ex. 3. But I need not rely on this document from Defendants and am able to resolve the Motion to Dismiss because "[i]ssues not briefed are deemed waived." *Emerald P'rs*, 726 A.2d at 1224 (citing *Loudon*, 700 A.2d at 140 n.3; *Murphy*, 632 A.2d at 1152).

[74] Compl. ¶ 71.

[75] *Id.* ¶ 80.

[76] *Id.* at Ex. A, § 8.4(a).

language provides for permissive advancement of attorneys' fees.[77] Thus, the count fails to state a claim upon which relief can be granted.

**B.** **The Court Grants the Motion to Dismiss with Respect to the Fiduciary Duty Claim**

Plaintiff contends that the Individual Defendants acted in bad faith, in violation of their duty of loyalty, by falsely disclosing "that the General Partner has taxable income even though it is a subchapter S corporation."[78] A general partner generally owes fiduciary duties to the limited partners,[79] but liability for fiduciary duties in the limited partnership context "may be expanded or restricted or eliminated by provisions in the partnership agreement."[80] In the instant case, the Agreement provides that the Individual Defendants are liable for actions constituting "fraud, bad faith, willful misconduct or gross negligence."[81] Plaintiff chose to proceed on a theory of bad faith.[82] Bad faith requires a defendant to

---

[77]    *Martinez v. Regions Fin. Corp.*, 2009 WL 2413858, at \*13-14 (Del. Ch. Aug. 6, 2009) (finding advancement rights where the agreement in question stated that "the Company agrees to pay as incurred . . . all legal fees and expenses").

[78]    Compl. ¶ 75.

[79]    *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del. Ch. 1981) (citations omitted).

[80]    *Lonergan*, 5 A.3d at 1017 (quoting 6 *Del. C.* § 17-1101(d)).

[81]    Compl. Ex. A, § 8.4(g).

[82]    *Id.* ¶ 75; Pl.'s Opp'n Br. to Mot. to Dismiss 21; Oral Arg. Tr. 36.

"intentionally fail[] to act in the face of a known duty to act, demonstrating a conscious disregard for his [or her] duties."[83]

In a September 27, 2013 memorandum to the Limited Partners, the General Partner stated that "in the absence of the [Fifth Amendment], the proposed [refinancing] would likely not be viable because it would impose a tax liability on the General Partner that the General Partner has no ability to pay."[84] On October 10, 2013, also before the vote on and enactment of the Fifth Amendment, the General Partner clarified that "[t]he shareholders of the General Partner would have a phantom tax liability (liability in excess of cash)," and that the "[s]hareholders of the General Partner would get cash to pay taxes triggered by the . . . refinancing (but no more)."[85] The "shareholders" of the General Partner are the Individual Defendants.[86] Regardless, Plaintiff still avers that the October memorandum "failed to disclose that the [tax liability] estimate was based on the effective tax rates of the Individual Defendants on their own personal tax returns."[87]

---

[83] *In re Answers S'holder Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012) (quoting *Lyondell Chem. v. Ryan*, 970 A.2d 235, 243 (Del. 2009)).

[84] Compl. Ex. G, at 6.

[85] *Id.* at Ex. H, at 2-3.

[86] *Id.* ¶¶ 12-15.

[87] Pl.'s Opp'n Br. to Mot. to Dismiss 26.

Plaintiff pleads no facts to support its allegation that the Individual Defendants acted in bad faith by disclosing that "in the absence of the [Fifth Amendment], the proposed [refinancing] would likely not be viable because it would impose a tax liability on the General Partner that the General Partner has no ability to pay."[88] Regardless, Defendants made an additional disclosure before the vote on the Fifth Amendment, which made clear exactly on whom the tax liability would fall—the Individual Defendants.[89] Plaintiff tries to save its claim by asking for further information regarding individual effective tax rates. To the extent this issue was even raised in the Complaint, and to the extent that issue is material here, Plaintiff still does not allege any facts or make any arguments to support its claim that Defendants "intentionally fail[ed] to act in the face of a known duty to act" or "conscious[ly] disregard[ed] . . . [their] duties" by failing to disclose this information.[90] Thus, I dismiss Plaintiff's fiduciary duty claim.

## IV. CONCLUSION

For the foregoing reasons, I deny Plaintiff's request to amend the Complaint and grant Defendants' Motion to Dismiss.

**IT IS SO ORDERED**.

---

[88] Compl. Ex. G, at 6.

[89] *Id.* at Ex. H, at 2-3.

[90] *In re Answers*, 2012 WL 1253072, at *7 (quoting *Lyondell*, 970 A.2d at 243).