# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| IN RE NANTHEALTH, INC. STOCKHOLDER LITIGATION | Lead C.A. No. 2018-0302-AGB |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

**WHEREAS:**[1]

A.     Nominal defendant NantHealth, Inc. ("NantHealth" or the "Company") is a healthcare company.  Its core product is a proprietary process to diagnose patients at the molecular level and predict the patient's response and resistance to particular treatments.  NantHealth offers this process, the Genomic Proteomic Spectrometry ("GPS") solution, under the brand name GPS Cancer.  Plaintiff Erik Petersen allegedly purchased NantHealth stock on June 14, 2016, and has held it continuously since then.

B.     Defendant Patrick Soon-Shiong founded the Company in July 2010 and has served as the Company's CEO and Chairman since then.  Soon-Shiong is also the Founder and CEO of three nonprofit entities:  the Chan Soon-Shiong Family

---

[1] The facts recited herein are taken from the Amended Complaint filed on October 29, 2018 (Dkt. 29), and documents incorporated therein.  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citation and internal quotations omitted) ("[P]laintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss).

Foundation, the Chan Soon-Shiong NantHealth Foundation, and the Chan Soon-Shiong Institute of Molecular Medicine (collectively, the "Nonprofits").

C. Defendant Paul A. Holt was the CFO of NantHealth until he resigned in August 2018. Defendant Edward Miller is a former director of the Company, serving from May 2016 to June 2017. The remaining four defendants—Michael Blaszyk, Mark Burnett, Kirk K. Calhoun, and Michael S. Sitrick—served on the board when this action was filed.

D. On September 15, 2014, the Nonprofits entered into an agreement with the University of Utah to donate $12 million to support the Heritage 1K project—a research project on the genetic causes of certain hereditary diseases (the "Gift Agreement").[2] Soon-Shiong signed the Gift Agreement on behalf of the Nonprofits.

E. The Gift Agreement provided that the University of Utah could use $10 million of the donation from the Nonprofits to pay outside entities to analyze patient data or perform work for the Heritage 1K project.[3] Any outside provider, however, was required to meet specific standards set out in the Gift Agreement that only NantHealth allegedly could satisfy.[4]

---

[2] Am. Compl. ¶¶ 44-45.

[3] *Id.* ¶ 46; Will Aff. Ex. D ("Gift Agreement") ¶ 4 (Dkt. 38). The remaining $2 million of the $12 million gift was designated "to provide scientific and administrative support for the Project and its scientific staff at the University." Gift Agreement ¶ 2.

[4] Am. Compl. ¶¶ 46-47.

F.     Before the Gift Agreement was executed, the University of Utah entered into a Memorandum of Understanding ("MOU") providing that "[d]onor-affiliated Scientists shall have the right to analyze the sequence data for any or all of the Heritage 1K projects" and requiring that the genetic analysis be performed "by a bioinformatics team associated with the Donor [*i.e.*, defendant Soon-Shiong]."[5]

G.     On January 28, 2015, the University of Utah and NantHealth entered into an agreement to provide comprehensive whole genome sequencing and other research services for the Heritage 1K project (the "Services Agreement").[6]   In exchange for the services, NantHealth received the $10 million from the Nonprofits. Soon-Shiong signed the Services Agreement for NanthHealth.

H.     In 2016, the Company hired Ernst & Young LLP ("EY") to perform an audit.  EY determined in an April 2016 report that the Gift Agreement and the Services Agreement "were linked," which NantHealth did not disclose.[7]

I.     On June 1, 2016, NantHealth commenced an initial public offering. The registration statement for the IPO disclosed that the Nonprofits had provided "partial" funding for the Heritage 1K project and that the University of Utah was not obligated to use NantHealth as part of the gift it received from the Nonprofits:

---

[5] Am. Compl. ¶¶ 4, 48, 50, 57.

[6] *Id.* ¶ 50; Will Aff. Ex. E.

[7] Am. Compl. ¶ 51; *see also* Will Aff. Ex. H ("EY Report") at 10.

At the request of the university, certain public and private charitable 501(c)(3) non-profit organizations provided *partial funding* for the sequencing and related bioinformatics costs associated with the project. . . . *The university was not contractually or otherwise required to use [NantHealth] as part of the charitable gift.*[8]

J.      In early August 2016, the Audit Committee of NantHealth's board, consisting of Blaszyk, Calhoun, and Sitrick, met three times and reviewed accounting methods and expected revenue for GPS Cancer.[9] On August 9, 2016, during an investor call, Soon-Shiong stated that NantHealth's "machines are running at full tilt" and the Company was "processing 350-whole genome simultaneously."[10] At this time, the Company was only expecting $85,000 in revenue from GPS Cancer for the quarter, yet the average price per sequence was $6,787.[11] On August 15, 2016, the Company filed its Form 10-Q, which included the same statements about the Heritage 1K project, quoted above, that appeared in the IPO documents.

K.      On October 6, 2016, the Audit Committee met to discuss, among other matters, the Company's financial results for the third quarter ended September 30, 2016, and how to calculate revenue for GPS Cancer.

---

[8] Am. Compl. ¶ 51 (emphasis added).

[9] *Id.* ¶¶ 66-69.

[10] *Id.* ¶ 70.

[11] *Id.*

4

L.    On November 7, 2016, the Company issued a press release highlighting the financial results for the third quarter.[12] The Company said that it had received 524 GPS Cancer orders, although NantHealth had only completed 334 GPS Cancer tests.[13] The Company stated that 180 of those orders were for the Heritage 1K project, which prevented the Company from recognizing any revenue from them.[14]

M.    On March 6, 2017, a medical publication, *STAT*, published an article that raised suspicions about the propriety of NantHealth's arrangement with the University of Utah and the commercial demand for GPS Cancer.[15] The article contended that this arrangement "made it possible for [the] company to inflate, by more than 50 percent, the number of test orders it reported to investors late last year while updating them on interest in . . . GPS Cancer . . . even though the work for the university did not have anything to do with diagnosing or recommending treatments for cancer patients."[16]

N.    On March 27, 2017, the entire board discussed, among other matters, GPS Cancer.[17] On March 31, 2017, the Company filed its Annual Report on Form

---

[12] *Id.* ¶ 75.

[13] *Id.*

[14] *Id.*

[15] *Id.* ¶ 84.

[16] *Id.* ¶ 85.

[17] *Id.* ¶ 82.

10-K, which included the same statements about the Heritage 1K project that appeared in the IPO documents and its August 2016 Form 10-Q.[18]

O.    On June 26, 2017, investors filed an amended complaint in a securities class action in the United States District Court for the Central District of California against all of the defendants in this action and other parties (the "Securities Action").[19]  On March 27, 2018, the district court denied defendants' motion to dismiss the Securities Action except as to one claim against Holt.[20]

P.    On April 23, 2018, Petersen filed his initial complaint in this action, which the court consolidated with a related case on July 30, 2018.  On October 29, 2018, Petersen filed an Amended Complaint asserting three derivative claims for breach of fiduciary duty (Count I), waste of corporate assets (Count II), and unjust enrichment (Count III).[21]

Q.    On November 14, 2018, defendants moved to dismiss the Amended Complaint in its entirety under Court of Chancery Rules 12(b)(6) and 23.1.  During briefing, Petersen withdrew Count II.[22]

---

[18] *Id.* ¶ 83.

[19] Will Aff. Ex. S ("Securities Action Complaint") ¶ 23.

[20] *Id.* Ex. T ("Securities Action Ruling"), at 10.

[21] Am. Compl. ¶¶ 138-50.

[22]  Pl.'s Opp'n Br. 60 n.20 (Dkt. 43).

NOW THEREFORE, the court having considered the parties' submissions,

IT IS HEREBY ORDERED, this 14th day of January, 2020, as follows:

1. **Legal Standards.** The standard governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[23]

2. Under Court of Chancery Rule 23.1, a stockholder who wishes to bring a derivative claim on behalf of a corporation must "allege with particularity the efforts, if any, made . . . to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort." There are two different tests for determining whether demand is excused under Delaware law:

> The test articulated in *Aronson v. Lewis* applies when a *decision* of the board of directors is being challenged in the derivative suit. The test set forth in *Rales v. Blasband*, on the other hand, governs when the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit, such as instances where directors are sued derivatively because they failed to do something.[24]

---

[23] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations omitted).

[24] *Feuer ex rel. CBS Corp. v. Redstone*, 2018 WL 1870074, at *8 (Del. Ch. Apr. 19, 2018) (citations and quotations marks omitted).

7

Under either test, a plaintiff "must impugn the ability of at least half the directors in office when [he] initiated [his] action . . . to have considered a demand impartially."[25] To do so, a plaintiff must allege a "constellation of facts that, taken together, create a reasonable doubt about [the director]'s ability to objectively consider a demand."[26]

3. **Count I.** This claim asserts that the individual defendants breached their fiduciary duty of loyalty "by allowing defendants to cause, or by themselves causing, the Company to make a series of false statements concerning the Company's relationship with the University and orders of GPS Cancer tests."[27]

4. Pre-IPO Statements. Defendants assert that Petersen lacks standing to bring a fiduciary duty claim based on pre-IPO statements because he was not a stockholder of the Company at that time.[28] Citing *Chirlin v. Crosby*,[29] Petersen counters that he can pursue claims for statements that pre-date his ownership under

---

[25] *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015) (citation omitted).

[26] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *18 (Del. Ch. Mar. 19, 2018).

[27] Am. Compl. ¶ 29.

[28] *See* 8 *Del. C.* § 327 ("In any derivative suit instituted by a stockholder of the corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law."). NantHealth's IPO occurred on June 1, 2016, before Petersen purchased NantHealth stock on June 14, 2016. Am. Compl. ¶¶ 3, 16.

[29] 1982 WL 17872, at *1 (Del. Ch. Dec. 7, 1982).

the continuing wrong doctrine because "the misleading nature of the public statements demonstrate a pattern and overall plan to inflate the perceived demand for GPS Cancer that constitutes a continuing wrong."[30]

5.    In *Chirlin*, the court explained that if "the wrong is a continuing wrong, the stockholder need only to have been the owner of stock during any time the wrong continued."[31]  As then-Vice Chancellor Strine explained in *Desimone v. Barrows*, however, if the alleged wrongs can be "easily segmented," the "continuing wrong" doctrine does not apply even if the "earlier wrongs that pre-date [one's] stock ownership . . . may be similar or related."[32]  Here, the alleged post-IPO "wrongs" easily can be segmented because each allegedly misleading statement during this period was made at different times with distinct contents.[33]  Accordingly, the continuing wrong doctrine does not apply and Count I is dismissed for lack of standing insofar as it seeks to challenge pre-IPO statements.

---

[30] Pl.'s Opp'n Br. 49-50.  Petersen also argues he has standing because pre-IPO statements were incorporated by reference into offering materials for a December 15, 2016 private placement of senior notes.  *See* Pl.'s Opp'n Br. 49.  This argument fails because the Amended Complaint does not identify which statements allegedly were incorporated by reference into the private placement.  *See* Am. Compl. ¶ 81.

[31] *Chirlin*, 1982 WL 17872, at *1.

[32] *Desimone v. Barrows*, 924 A.2d 908, 924-25 (Del. Ch. 2007).

[33] *See* Am. Compl. ¶¶ 63-83.

6.      Post-IPO Statements.  The Amended Complaint challenges post-IPO statements that were made from July 25, 2016 to March 31, 2017 in two press releases, during investor calls, in two quarterly reports, and in one annual report.[34] The challenged disclosures fall into three categories, *i.e.*, (i) misrepresentations that the Nonprofits' $12 million gift to the University of Utah did not obligate the University to obtain services from NantHealth when, in actuality, it did; (ii) misrepresentations that the Nonprofits provided only partial funding for the Heritage 1K project when, in actuality, they provided the entire funding; and (iii) statements portraying the commercial demand for GPS Cancer to be greater than it was.[35] Defendants' lead argument for dismissal of Count I insofar as it challenges post-IPO disclosures is that plaintiff failed to make a demand under Rule 23.1.

7.      Demand Futility.  When this action was filed, there were five directors on the Company's board:  Soon-Shiong, Blaszyk, Burnett, Calhoun, and Sitrick (the "Demand Board").[36]  The question before the court is whether plaintiff has plead with sufficient particularity facts that create a reasonable doubt concerning the

---

[34] *Id.*

[35] *See id.* ¶¶ 45-49, 63, 72-73, 75-78, 83, 85, 88; *see also* Mot. to Dismiss Hr'g Tr. 18-25 (Sept. 25, 2019) (Dkt. 58).

[36] Am. Compl. ¶ 101.

disinterestedness or independence of three of these individuals so as to impugn the ability of at least half of the Demand Board to consider a demand impartially.[37]

8.     Defendants concede for purposes of this motion, as they credibly must, that Soon-Shiong is interested.[38]  The gravamen of the Amended Complaint is that Soon-Shiong caused the Nonprofits he controlled to make a donation to the University of Utah with the understanding—which was not disclosed—that the University would be required to turn around and pay those funds (less some "scientific and administrative support" costs) to NantHealth to use its GPS technology.  As NantHealth's controlling stockholder, Soon-Shiong stood to benefit from this scheme to make it appear as if a prestigious institution independently had endorsed NantHealth's technology and that there was greater commercial demand for GPS Cancer than there actually was.

9.     Petersen asserts two different theories for demonstrating demand futility as to Count I depending on the target of the claim.  With respect to Soon-Shiong, the inquiry is whether two or more of the other four directors on the Demand Board lacked independence from Soon-Shiong so as to raise a reasonable doubt about their impartiality to bring a claim against him.  With respect to the remaining

---

[37] As noted above, this is the key inquiry under either the *Aronson* or *Rales* test.  The parties' submissions analyze the demand futility question in this manner, as will the court.

[38] Defs.' Opening Br. 18 (Dkt. 37).

11

six defendants, the inquiry is whether Blaszyk, Burnett, Calhoun, and Sitrick faced a substantial likelihood of liability with respect to the claim so as to raise a reasonable doubt about their impartiality to bring a claim against themselves as well as against Holt and Miller.[39] The court begins with the second theory.

10. NantHealth's certificate of incorporation contains a provision exculpating its directors for breaches of the duty of care,[40] and Petersen has not alleged that any of the directors other than Soon-Shiong stood to receive a personal benefit from the challenged conduct. Thus, to demonstrate that Blaszyk, Burnett, Calhoun, and Sitrick face a substantial likelihood of liability with respect to the disclosure issues described in paragraph 6, Petersen must allege with particularity facts demonstrating that they acted in bad faith. This means that Petersen must plead facts demonstrating that these directors "intentionally fail[ed] to act in the face of a

---

[39] *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) ("[T]he mere threat of personal liability . . . standing alone, is insufficient . . . [.] [It must be apparent] on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."). Petersen also argues that Blaszyk, Burnett, Calhoun, and Sitrick face a substantial likelihood of liability in the Securities Action. Pl.'s Opp'n Br. 48. This argument is irrelevant to the demand futility analysis here because these four individuals were named as defendants in the Securities Action only with respect to a Section 11 claim regarding *pre-IPO* statements. *See* Securities Action Complaint ¶ 166. As discussed above, Petersen lacks standing to challenge pre-IPO statements in this action.

[40] Will. Aff. Ex. U (NantHealth Certificate of Incorporation) Article X, Section 1. Perhaps because of the existence of this exculpation provision, Petersen has not asserted an oversight claim under *In re Caremark Int'l Inc. Deriv. Litig.*, 689 A.2d 959 (Del. Ch. 1996). Pl.'s Opp'n Br. 46.

known duty to act, demonstrating a conscious disregard for [their] duties"[41] or, as the authorities cited in Petersen's own brief explain, that they knew of the falsity of the challenged disclosures when they were made.[42] Petersen has not done so.

11. With respect to the first two categories of challenged disclosures— concealing that the University of Utah was required to use the funds from the Nonprofits to obtain services from NantHealth and that those funds accounted for all of the funding for the Heritage 1K project—the Complaint contains allegations that cut against demonstrating scienter on the part of these directors. To start, the Complaint acknowledges that Blaszyk, Burnett, Calhoun, and Sitrick each joined the board in May 2016, after the Gift Agreement, MOU and the Services Agreement were in place.[43] More importantly, referencing documents Petersen received in response to an inspection demand, the Complaint alleges the board *lacked* knowledge about the MOU and did not discuss key documents relevant to the Company's relationship with the University that should have put them on notice that the Nonprofits were the sole source of funding for the Heritage 1K project:

---

[41] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (citation and internal quotations omitted).

[42] *See* Pl.'s Opp'n Br. 44-45 (citing *City of Hialeah Emps.' Ret. Sys. v. Begley*, 2018 WL 1912840, at *2 (Del. Ch. Apr. 20, 2018) (ORDER) ("directors in fact knew about the misleading nature of [the Company's statements]") and *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998) (directors "deliberately misinformed shareholders")).

[43] Am. Compl. ¶¶ 20-24.

The books and records produced show that the Board never reviewed any other documents related to [Soon-Shiong's gift] to the University. The board did not discuss the relationship between the University retaining the Company for the [Heritage 1K project] and defendant Soon-Shiong's . . . gift. . . . In fact, the Board never discussed the *STAT* article despite its revelations driving down the stock price.[44]

12. Petersen alleges that the four outside directors nonetheless had scienter with respect to the first two categories of statements because they were familiar with EY's audit report.[45] In its report, EY finds linkage between the Gift and Services Agreements because the University had to receive funding from the Nonprofits before paying NantHealth.[46] Critically, however, EY's report does not disclose that the University could only use the funds it received from the Nonprofits to obtain services from NantHealth; nor does it rule out that other funds were available for the Heritage 1K project. Thus, the fact that EY linked the two agreements is insufficient

_____

[44] *Id.* ¶ 12; *see also id.* ¶ 106. Contrary to Petersen's suggestion that the importance of the product to the Company permits an inference of knowledge, the "core operations" doctrine only applies when the directors are alleged to have received notice of the wrongdoing. *See In re Fitbit, Inc. S'holder Deriv. Litig.*, 2018 WL 6587159, at *15 & n.179 (Del. Ch. Dec. 14, 2018) (discussing the core operations doctrine and finding enough facts to support a reasonable inference of knowledge because, among other things, "management was keeping the Board apprised of the problems and the efforts to address them, and that, all the while, Fitbit was touting the promise and success of [the technology] to the market"). Here, although Petersen alleges that the Company's success hinged on GPS Cancer, Petersen does not allege that the directors were aware of any wrongdoing.

[45] Am. Compl. ¶¶ 53, 106. It is reasonable to infer that the outside directors read the EY report because they acknowledged that the financial statements contained in the IPO documents were prepared in reliance on the EY audit, and the report is addressed to NantHealth's board. EY Report at 1.

[46] EY Report at 10.

14

to infer knowledge on behalf of Blaszyk, Burnett, Calhoun, or Sitrick about an illicit arrangement with the University or the exclusive nature of the funding the Nonprofits provided for the Heritage 1K project.[47]

13.     With respect to the third category of statements, Petersen asserts that Blaszyk, Calhoun, and Sitrick knew the statements about the demand for GPS Cancer tests were misleading because, as members of the Audit Committee, they discussed expected GPS Cancer revenues, reviewed quarterly financial results, and reviewed matters relating to GPS Cancer.[48]  Petersen fails, however, to allege what information in these Audit Committee discussions contradicted the statements in the public filings, or that Blaszyk, Calhoun, and Sitrick attended the investor call where Soon-Shiong allegedly made misleading statements.[49]

---

[47] The Complaint alleges that Sitrick, "as a trustee of [one of the Nonprofits], would also know about the terms of the 'gift' to the University, including that it was effectively a quid pro quo to use the Company."  Am. Compl. ¶¶ 105-06.  This allegation is conclusory and lacks the necessary particularity to demonstrate scienter on Sitrick's part.  Even if the allegation were credited, however, it would not change the outcome because it does not apply to any of the other three outside directors (Blaszyk, Burnett, and Calhoun) who constitute a majority of the Demand Board.

[48] Am. Compl. ¶¶ 66-69, 74.

[49] *See id.* ¶¶ 71 (Soon-Shiong's statements on the August 9, 2016 investor call were improper because "[a]s he must have known, the Company was only expecting $85,000 in revenue from GPS Cancer for the quarter.  The Company could not have been running 'full tilt' or conducting 350 tests with such little revenue expected."), 75 (The company's November 7, 2016 press release included data on the number of completed GPS Cancer tests that "stood in stark contrast to defendant Soon-Shiong's previous statement [on the August 9, 2016 investor call] that the Company was already processing 350 orders.").  The

14.     For the reasons discussed in paragraphs 7-13, the court concludes that Petersen has failed to plead with sufficient particularity facts demonstrating that a majority of the Demand Board (*i.e.*, Blaszyk, Burnett, Calhoun, and Sitrick) faced a substantial likelihood of liability with respect to Count I.  Thus, Petersen has failed to raise a reasonable doubt about their impartiality to bring a claim against themselves, Holt and Miller.  Accordingly, the motion to dismiss Count I under Court of Chancery Rule 23.1 is **GRANTED** as to defendants Blaszyk, Burnett, Calhoun, Sitrick, Holt, and Miller.

15.     The court reaches a different conclusion with respect to the pursuit of Count I against Soon-Shiong because, for the reasons discussed next, Petersen has adequately pled a constellation of facts that create a reasonable doubt about Burnett and Sitrick's independence from Soon-Shiong such that a majority of the Demand Board could not have impartially considered a demand against Soon-Shiong.

16.     As to Burnett, the Complaint alleges that he entered into an agreement with Soon-Shiong in November 2016 when joining the boards of two Soon-Shiong controlled entities—NantHealth and NantBioSicence, Inc.—whereby Burnett was provided options to acquire common stock valued at $10 million on the date of grant,

---

transcript of the August 9, 2016 investor call indicates that Blaszyk, Calhoun, and Sitrick were not in attendance.  *See* Will Aff. Ex. L.

16

which would vest in 25% tranches over four years.[50] When this action was filed, three tranches had not vested. Thus, a vote in favor of suing Soon-Shiong would put at risk Burnett's remaining $7.5 million worth of stock options in addition to the equity he would receive if NantBioScience were to go public. The Complaint further alleges that in February 2015, Soon-Shiong provided cancer treatment to Burnett's son free-of-charge, that Burnett was not listed as an independent director of the Company in a May 2016 public filing and that NantHealth's board determined that Burnett was not independent in March 2017—about one year before this action was filed.[51]

17. As to Sitrick, who also was not listed as an independent director of the Company in a May 2016 public filing, the Complaint alleges he has known Soon-Shiong for approximately twenty years and served on the boards of several of his entities.[52] Sitrick is the founder, CEO and Chairman of Sitrick and Company, which has provided public relations services to at least one Soon-Shiong-controlled entity and to Soon-Shiong personally since 2002.[53] Sitrick also serves as director of one of the Nonprofits and has served as a trustee of the St. John's Health Center

---

[50] Am. Compl. ¶ 115.

[51] *Id.* ¶¶ 82, 114-16.

[52] *Id.* ¶ 120.

[53] *Id.* ¶¶ 114, 126.

Foundation with Soon-Shiong, which is the recipient of at least $100 million from that same Nonprofit affiliated with Soon-Shiong.[54]  In a book he published in January 2018, just a few months before this action was filed, Sitrick wrote about Soon-Shiong in exceptionally glowing terms that, combined with his lengthy personal and professional relationship with Soon-Shiong, cast further substantial doubt on his ability to be impartial in deciding whether or not to initiate litigation against him:

> [Soon-Shiong] is also one of the most compassionate men I have ever met, the personification of the caring doctor you used to see in TV dramas . . . . [Soon-Shiong] is someone I am honored to call my friend and client, and it has been a privilege to work alongside him, both as a strategic public relations counsel and as a member of his various boards of directors, including those of APP, Abraxis BioScience, and one of his two new public companies, NantHealth . . . .  The value of his work is incalculable.  At the risk of using what has become an overused term, it is priceless.[55]

18.     Having determined that demand is excused as to Count I against Soon-Shiong, the next question is whether Count I states a claim for relief against him.  It clearly does.  As discussed above, Count I alleges that Soon-Shiong orchestrated a scheme for his personal benefit by secretly directing a contribution from the Nonprofits he controls to NantHealth through a respected educational institution in order to burnish the Company's image and artificially inflate the perceived demand

---

[54] *Id.* ¶¶ 103, 129.

[55] *Id.* ¶ 127.

for GPS Cancer. Significantly, the district court in the Securities Action determined there were sufficient facts regarding the same post-IPO conduct alleged here to infer scienter on behalf of Soon-Shiong under the heightened pleading standard of the Private Securities Litigation Reform Act of 1995.[56] Based on these facts, it is reasonably conceivable that Soon-Shiong could be found to have violated his duty of loyalty to the Company. Accordingly, for the reasons explained above, the motion to dismiss Count I is **DENIED** as to defendant Soon-Shiong.

19. **Count III.** This claim asserts that the individual defendants "were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to NantHealth."[57] A claim for unjust enrichment under Delaware law includes five elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[58]

---

[56] Securities Action Ruling at 6 ("Soon-Shiong was allegedly, intimately involved with the nonprofits, the MOU, the Agreements, and was the catalyst of the relationship between NantHealth and the University. . . . Accordingly, assessing the allegations holistically, Plaintiffs have alleged sufficient facts to raise a strong inference that Soon-Shiong intentionally, knowingly, or with deliberate recklessness, misrepresented, or omitted material facts, regarding the relationship between the University and NantHealth, and NantHealth's total orders of GPS Cancer.").

[57] Am. Compl. ¶ 148.

[58] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

20. In support of this claim, Petersen relies on *Calma ex rel. Citrix Sys., Inc. v. Templeton*.[59] That reliance is misplaced. In *Citrix*, the court concluded it was reasonably conceivable that a stockholder could obtain a recovery from directors under a theory of unjust enrichment for granting themselves restricted stock units where the directors' approval of the restricted stock units was the basis for a viable—albeit duplicative—claim for breach of fiduciary duty.[60] Here, the conduct underlying the fiduciary duty claim—allegedly making false and misleading disclosures—is unrelated to the directors' receipt of compensation from the Company. Thus, Petersen has failed to plead the necessary relationship between the conduct at issue and the alleged harm to the Company to support a claim for unjust enrichment. Accordingly, the motion to dismiss Count III for failure to state a claim under Rule 12(b)(6) is **GRANTED**.

_____
Chancellor

---

[59] 114 A.3d 563 (Del. Ch. 2015).

[60] *Id.* at 591-92.