# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KRISTEN C. WRIGHT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 11536-VCG |
| | ) | |
| CLINTON A. PHILLIPS, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: February 21, 2020
Date Decided: May 28, 2020

Richard E. Berl, Jr., of HUDSON, JONES, JAYWORK & FISHER, LLP, Lewes, Delaware, *Attorney for Petitioner.*

Stephen A. Spence, of BAIRD MANADLAS BROCKSTEDT, LLC, Lewes, Delaware, *Attorney for Respondent.*

GLASSCOCK, Vice Chancellor

This superannuated matter has here reached, I hope, its last hurrah. Practitioners before this Court often refer, metaphorically, to litigation regarding the break-up of joint ventures and the like as "business divorces." Occasionally, the Court must resolve true business divorces, as joint romantic and business relationships come a-cropper. These matters, in my experience, are among the most contentious in our docket, and likewise provide the forum where it is most likely that litigation effort will be disproportionate to the amounts at stake. Such litigation, and the underlying behavior of the parties so engaged, increases my admiration of my Family Court colleagues' dogged pursuit of just litigation outcomes, without, on my part, any hint of jealousy for their dockets.

This is one such unfortunate litigation. Petitioner Kristen C. Wright and Respondent Clinton A. Phillips were wife and husband, and together owned a recycling business reposed in several entities of which they were co-owners. They divorced, and the resulting divorce agreement confirmed their continuing ownership of the business, fifty/fifty. As is not unusual in such circumstances, the problems that drove them apart as marriage partners apparently left them unable to continue to function as business partners as well. Both parties in this litigation made allegations of breach of fiduciary duty and other contract- or tort-based misconduct against the other. Ultimately, a receiver was appointed and Phillips agreed to buy out Wright. I held a valuation trial and valued the entities. All that remains is to

apply certain offsets requested by the parties to the valuation of Wright's interest to be purchased by Phillips. Those issues are addressed below.

## I. BACKGROUND[1]

The parties held a one-day trial on November 18, 2019 and submitted a joint exhibit list of 78 exhibits. The following facts were stipulated by the parties or proven by a preponderance of evidence at trial. I also draw some general background facts from a previous decision rendered in this case.[2]

*A. The Parties*

Petitioner Wright and Respondent Phillips are former joint business owners and former spouses, divorced under a Final Decree of the Family Court of the State of Delaware in 2013.[3]

Non-parties Data Guard, Inc. ("DG Shredding"), Data Guard Recycling, Inc. ("DG Recycling"), CK Aurora, Inc., and CK Aurora Business Ventures, LLC ("CK Aurora") are businesses that Wright and Phillips jointly owned.[4] I refer to these businesses collectively as the "Companies."

---

[1] The parties submitted joint trial exhibits. Citations to the joint trial exhibits are expressed as JX __, at __. Citations in the form "Tr." refer to the trial transcript. At my request, the parties also submitted a Joint Stipulation of Facts. Joint Stipulation of Facts, Docket Item ("D.I.") 166 ("JSOF").

[2] *Wright v. Phillips*, 2017 WL 6539383 (Del. Ch. Dec. 21, 2017).

[3] JSOF, ¶ 1.

[4] *Wright*, 2017 WL 6539383, at *1; JX 1, ¶ 2(a).

*B. Factual Background Regarding the Parties, the Companies, and the Litigation*

       1. <u>The Divorce and the Buyout</u>

As a part of their divorce in 2013, the parties entered an Ancillary Consent Order and Agreement (the "Divorce Agreement") on October 18, 2013.[5] Under the Divorce Agreement, the parties continued to own and operate the Companies jointly until 2015.[6] In 2015, the parties sued each other, alleging breaches of fiduciary duty and contract, with each party seeking to force a sale of the Companies.[7] However, while the litigation was still in its nascent stages, the parties reached an agreement that Phillips would purchase Wright's fifty-percent interest in each of the jointly owned businesses.[8]

Following an evidentiary hearing for the purpose of valuing Wright's half of the Companies, I issued a Letter Opinion on December 21, 2017 holding that "[t]aken together, the combined pre-adjustment value of the [Companies] is $1,767,465, with a pre-adjustment half interest value of $883,733."[9] The parties litigated further over anticipated adjustments, and I held a second hearing on May 1,

---

[5] JX 1.

[6] *Wright*, 2017 WL 6539383, at *1. The Divorce Agreement governed certain aspects of the parties' continued joint ownership of the Companies. JSOF, ¶ 2; JX 1, ¶ 2.

[7] *Wright*, 2017 WL 6539383, at *1.

[8] *Id.*

[9] *Id.* at *5.

2019, where I adjusted the value of the Companies to $2,196,003.[10] Given this adjustment, I declared Wright's fifty-percent interest to be worth $1,098,001.50 (the "Valuation Price").[11]

Both parties, as of the time of the May 1, 2019 hearing, anticipated a further accounting phase to make additional adjustments. The parties differed on the scope of this final phase of litigation: Wright seeks two accounting adjustments to increase the Valuation Price;[12] Phillips seeks to decrease or eliminate the Valuation Price both through accounting adjustments and by demonstrating Wright's liability for the breach of fiduciary duty and contract counterclaims he originally brought.[13]

### 2. Wright's Work History and Earnings

Wright is a Certified Public Accountant.[14] During the parties' marriage, she assisted with bookkeeping and tax preparation for the Companies while acting as primary caregiver for the parties' children.[15] To facilitate these dual roles, Wright generally worked from home in an office the parties built onto their residence.[16] By

---

[10] JSOF, ¶ 5.

[11] *Id.*

[12] *See* Pet'r Kristen Wright's Closing Argument, D.I. 167 ("Petitioner's Opening Br."), at 2.

[13] Resp't's Post-Trial Closing Argument, D.I. 168 ("Respondent's Opening Br."), at 20; Resp't's Reply to Pet'r's Post-Trial Closing Argument, D.I. 170 ("Respondent's Reply Br."), at 1–3.

[14] Tr. 100:2–101:16 (Phillips).

[15] *Id.*

[16] JSOF, ¶ 37.

shortly before the divorce, however, Wright had begun to spend more hours at the office.[17]  As a part of the Divorce Agreement, Wright agreed to take equal responsibility for the operation of the Companies.[18]  As time went on, though, her appearances at the office dwindled.[19]  For almost nine months preceding the appointment of a receiver for the Companies in February 2016, Wright did not appear in the office at all.[20]  Because of this situation, Phillips testified that he had to transport materials back and forth from Wright's home to provide her with work, as had been the "standard operating procedure" prior to their divorce.[21]

Due to deadlocks between the parties that made operation of the Companies impossible, on February 2, 2016, I appointed Jennings Hastings, CPA, with the firm of Faw Casson Company, as interim receiver (the "Receiver").[22]  Following his appointment, the Receiver set expectations that Wright would work from 8:00 a.m. to 4:00 p.m. daily in the office.[23]  At the time he set these expectations, the Receiver

---

[17] Tr. 30:18–24 (Phillips).

[18] JX 1, ¶ 2(a) ("Each party shall also be equally responsible for the ongoing management and operation of the businesses in all respects."); Tr. 29:3–30:1 (Phillips).

[19] Tr. 32:19–33:8 (Phillips).

[20] *Id.* at 231:10–14 (Wright).

[21] *Id.* at 35:9–36:5 (Phillips).

[22] JX 2.

[23] JSOF, ¶ 13; Tr. 231:15–24 (Wright).  The parties no longer had children in the home at this point, which previously was Wright's primary reason for working from home.  JSOF, ¶ 13.

was unaware of Wright's lengthy work-from-home history.[24]  By that point, the parties' relationship, both personally and professionally was, to put it succinctly, strained.[25]  The parties stipulated to the fact that their "presence . . . together at times created a toxic environment."[26]  Wright generally agreed to the Receiver's expectation, with conditions.[27]  She expressed concern to the Receiver about her personal safety while she was at the office and made her presence there contingent on safety protocols.[28]

Wright's behavior at the office, according to Phillips, was disruptive.[29]  She attempted on multiple occasions to fire personnel he considered integral to operations.[30]  A few months after the Receiver's appointment, Wright's hours at the office once again dwindled.[31]  In April 2016, the Receiver sent the parties a list of

---

[24] Tr. 145:5–13 (Hastings).

[25] *See, e.g.*, JX 23, at 2 (text message warning, "[s]top fucking with my employee.  I will burry [sic] your ass."); JX 21 (desktop background installed by Wright on Phillips' computer reading, "I have your diagnosis.  You're an asshole.  Kill yourself.").

[26] JSOF, ¶ 35.

[27] *Id.* ¶ 13; Tr. 231:15–233:18 (Wright).

[28] JSOF, ¶ 36; JX 33, at 1 (Wright emailing Receiver, "[f]or my safety I feel it is necessary to change locks on my office doors as I will work with the door locked when I am there.  Also, I will not work past 4pm because I can[]not run the risk of being on property with no one but [Phillips] and me there.  He has locked me into spaces at the plant where the only way for me to get out was to climb a barbed wire fence.").

[29] Tr. 33:21–35:8 (Phillips); JX 19.

[30] *See* JX 23, at 2–4; Tr. 112:24–113:20 (Smith).

[31] *See* JX 29; JX 30; Tr. 114:22–116:5 (Smith), 127:18–22 (Hastings).

responsibilities, intending, among other things, to give Wright "more responsibility for the accounting function of the companies. . ."[32]

In addition to work issues, Wright was involved in two incidents at the office where she removed files and equipment. The parties characterize these incidents differently: Phillips described them as "weekend raids" that undermined the basic operations of the Companies[33]; Wright described them as necessary transfers of files or equipment she required in order to file taxes and work from home, given the toxic environment at the office.[34]

The first incident occurred in August 2015.[35] Wright entered the office after hours and removed computers and other equipment.[36] Among other things, Wright removed computers that contained certain QuickBooks files and software for the shredding business.[37] Phillips testified that the removal left the office space "trashed" and "in shambles."[38] While Wright had this equipment, the business performed certain essential tasks by hand, which Phillips testified disrupted

---

[32] JSOF, ¶ 14; JX 6, Ex. 1, at 3.

[33] Respondent's Opening Br., at 2.

[34] Pet'r's Response to Resp't's Closing Argument, D.I. 169 ("Petitioner's Reply Br."), at 5, 7–8.

[35] Tr. 223:7–12 (Wright).

[36] JSOF, ¶ 9.

[37] Tr. 38:4–20 (Phillips).

[38] *Id.*

7

operations.[39] Wright, on the other hand, testified that she merely "swapped" certain equipment to allow her to work from home with programs she needed on her local hard drive.[40] Wright testified that she provided instructions for personnel to log into the systems remotely, and that any disruptions were caused by their unfamiliarity with remote access procedures.[41] She eventually returned the computers and worked from the office, but she testified that she continued to be deprived of internet access and other basic amenities.[42]

The second incident occurred in April 2017.[43] The Receiver had instructed that all company files should remain in the office.[44] Wright, however, came in on a weekend and removed approximately seventy percent of the physical files from the office without notifying the Receiver.[45] She testified she required these files to complete personal tax returns.[46] The removed files were hardcopy backup files to entries on the QuickBooks system, and while they were absent, no one at the Companies requested their return.[47] Wright eventually returned the records under

---

[39] *Id.* at 40:16–43:24 (Phillips).

[40] *Id.* at 191:4–192:13 (Wright).

[41] *Id.* at 192:14–193:2 (Wright).

[42] *Id.* at 194:9–20 (Wright), 145:22–148:1 (Hastings); JX 33.

[43] Tr. 77:7–17 (Phillips); JX 28.

[44] JSOF, ¶ 10.

[45] *Id.* ¶ 11.

[46] Tr. 193:3–194:4 (Wright).

[47] *Id.* at 121:4–17 (Smith).

court order a year-and-a-half later.[48]  Both the August 2015 and the April 2017 incidents occurred without permission and without notifying Phillips or the Receiver.[49]

Phillips also testified that Wright's practices with accounting caused dangerous cash shortages.  The parties typically compensated themselves by transferring cash from the Companies to CK Aurora—which they treated as the management company—and paying themselves from CK Aurora.[50]  In the fall of 2015, Wright increased the amounts going to CK Aurora by an excess of $70,000 over  a six-week period.[51]  Phillips testified that these increased payments created a severe cash shortage that required him to support operations with personal funds.[52] Wright, in turn, testified that Phillips' improper comingling of personal and business funds caused the cash shortages in the first place.[53]

---

[48] *Id.* at 229:12-22 (Wright); Order for Interim Relief, D.I. 117.

[49] Tr. 227:5–17 (Wright); *see also* JX 42; JX 43; JX 44.

[50] Tr. 44:16–45:7 (Phillips).

[51] *Id.* at 45:20–47:12 (Phillips); JX 69 (check numbers 4777, 4799, 4800, 4802, and 4813).

[52] Tr. 49:6–51:2 (Phillips); JX 68, at 8 (bank statement showing operating account at just over $3,000).

[53] Tr. 236:24–237:11 (Wright); *see also* JX 56.

Ultimately, the Receiver testified that he did not believe the Companies sustained losses or damages as a result of the parties' conflicts during his appointment.[54]

*C. Factual Background Regarding Accounting Adjustments*

       1. <u>Wright's Personal Credit Cards</u>

The parties both possessed business and personal credit cards.[55] Phillips testified that he discovered Wright was paying personal credit card bills using company funds.[56] He reviewed QuickBooks and bank records to explore the extent of Wright's alleged misuse of personal credit cards.[57] At trial, Phillips testified that while he could not "remember the specifics," the misuse "was in the hundreds of thousands of dollars."[58] He also testified "there were, like, 20 different credit cards that were not company credit cards that were controlled by Mrs. Wright."[59]

Wright testified, to the contrary, that while business funds were used to pay personal credit cards, the transactions were mostly legitimate business expenses.[60] She testified the payments resulted from personal credit cards that both parties kept

---

[54] JSOF, ¶ 34; Tr. 143:10–21 (Hastings).

[55] *See* Tr. 88:5–12 (Phillips).

[56] *Id.* at 88:13–89:11 (Phillips).

[57] *Id.* at 89:12–90:17 (Phillips).

[58] *Id.* at 90:18–23 (Phillips).

[59] *Id.* at 94:21–24 (Phillips).

[60] *See id.* at 205:2–10 (Wright).

at the office for use by the Companies' truck drivers, and also that despite attempts to keep them separate, the parties sometimes put business expenses on personal credit cards.[61]

### 2. Wright's Movement of Funds to New Company Accounts

In September 2017, Wright removed $45,000 from two of the Companies' operating accounts into two new company bank accounts that she controlled.[62] She wrote to the Receiver that she did so because Phillips had opened new bank accounts without her knowledge and was similarly moving funds out of the operating accounts; thus, she felt she needed to withdraw money to ensure she had funds to pay professional and legal fees.[63] The Receiver instructed Wright to transfer the $45,000 back into the operating accounts once Phillips reinstated her salary—which he had unilaterally cut off—but Phillips never reinstated the salary, and so Wright never returned the funds.[64] Wright used the bulk of the funds in the new bank accounts to pay legal and professional fees for this litigation.[65] No funds remain in the accounts.[66]

---

[61] *Id.* at 205:2–10 (Wright).

[62] *Id.* at 19:2-15 (Sterner), 238:16-239:2 (Wright); JX 56.

[63] JX 56.

[64] JX 65.

[65] Tr. 21:21–22:3 (Sterner), 242:21–243:7 (Wright); *see also* JX 18.

[66] Tr. 243:14–16 (Wright).

### 3. The Parties' Joint Account

From early in their marriage, the parties operated a joint bank account (the "Joint Account"), which they used as their personal checking account.[67] The Divorce Agreement obliged the parties to make equal contributions to the Joint Account and only spend funds from the account with the other party's approval.[68] After Phillips raised concerns, the Receiver, authorized by court order, investigated the Joint Account.[69] In my May 24, 2016 receivership order, I instructed the parties to provide documentations to the Receiver "in order to fully reconcile [the Joint Account] issue and determine whether either party or the businesses were negatively affected by such transactions and, in such event, to report his findings to the Court."[70]

Both parties' experts, as well as the Receiver, confirmed that contributions to the Joint Account were equal.[71] The Receiver issued a report concluding that Wright spent $119,880 more than Phillips from the Joint Account.[72] In addition, in the same report, the Receiver concluded that Wright received distributions from the

---

[67] JX 1, ¶ 13; JSOF, ¶ 31.

[68] JX 1, ¶ 13.

[69] JX 3, at 1–2; JX 4, at 1; Tr. 157:22–158:4 (Hastings).

[70] JX 3, at 2.

[71] JX 10, at 1; JX 16, at 1; Tr. 154:9–12 (Hastings).

[72] JX 10, Ex. A, "Summary"; Tr. 141:4–142:18 (Hastings).

Companies in excess of Phillips in the amount of $36,801.[73] Wright does not dispute Phillips' contention regarding her excess spending from the Joint Account. She does, however, contend that she managed spending from the Joint Account for both parties and had done so for almost their entire marriage, and that many of her withdrawals were to provide spending cash to Phillips.[74]

4. Phillips' Use of His Personal Bank Account for Business Purposes

Early in the litigation, the Receiver instructed Phillips to cease utilizing his personal bank account for business purposes, as it caused comingling of funds.[75] Wright's expert, Charles Sterner, reviewed bank records, checks, and deposits associated with Phillips' personal bank accounts and concluded that of the business income deposited into those accounts, Phillips failed to return $38,545.61.[76] However, after reviewing Phillips' expert's report, Sterner made a correction, reducing that amount to $35,545.61.[77]

Both the Receiver and Sterner agree that Phillips was using personal funds to help run the Companies in 2015 and 2016.[78] Phillips testified the discrepancies

---

[73] JX 10, Ex. B, "Summary"; Tr. 141:4–142:18 (Hastings). The Receiver's conclusions regarding these distributions do not appear to be related to the Joint Account. This is discussed further in the Analysis, below.

[74] Tr. 205:17–207:5 (Wright).

[75] JX 6, Ex. 1, at 1.

[76] JX 15, at 1–3.

[77] JX 17, at 1.

[78] JX 6, Ex. 1, at 1; JX 15, at 3.

alleged by Wright are explained by the fact that he occasionally assisted customers with "one-off" projects that were outside the Companies' ordinary scope of business but were nonetheless customer-related.[79] Thus, according to Phillips, Sterner failed to recognize that some of the payments from Phillips' personal accounts were in fact business expenses.[80] Phillips also testified that the cash crunch caused by Wright's accounting practices forced him to write business checks from his personal accounts in the first place.[81]

### 5. The Costs of the Receiver and Legal Fees Paid by the Companies

Under the receivership order of February 2, 2016, "[t]he compensation of the Receiver . . . shall be paid as an expense to the businesses."[82] To date, the Companies have paid the Receiver a total of $174,307.17.[83] Of these costs, certain amounts occurred after Phillips purchased Wright's portion of the Companies in 2017; however, these additional expenses resulted largely from Phillips' failure to cooperate with payment orders following the sale.[84] On December 6, 2018, I ordered

---

[79] Tr. 250:21–253:1 (Phillips).

[80] *Id.*

[81] *Id.* at 50:4–18 (Phillips); *see also id.* at 159:18–160:4 (Hastings).

[82] JX 2, at 3.

[83] JSOF, ¶ 7.

[84] *See* Mot. for Payment of Receiver's Fees, D.I. 124 (requesting payment for "outstanding invoices and/or unbilled time entries that currently exist and that may be necessary as [Receiver] extricates himself from this matter."); Order dated December 6, 2018, D.I. 126 (ordering Respondent Phillips and Companies to split remaining costs of Receiver).

that Phillips and the Companies should split the costs for the remaining Receiver's fees.[85] I also noted, however, at a hearing, that Phillips could seek to have the post-valuation Receiver's fees "applied as a court cost at the final resolution" of the litigation.[86]

During this litigation, at the Receiver's direction, the Companies also paid legal and professional fees for both parties.[87] As described above, in September 2017, Wright removed $45,000 from the operating accounts without consulting the Receiver, and she deposited these funds into two new accounts that she controlled.[88] Wright used the $45,000 to pay for legal fees.[89]

---

[85] Order dated December 6, 2018, D.I. 126 (ordering Respondent Phillips and Companies to split remaining costs of Receiver).

[86] *See* Teleconference on Application for Payment of Receiver's Fees, D.I. 127. The transcript of this telephonic hearing was not made part of the docket. Phillips stated in post-trial briefing, "[t]he Court stated on the record during the December 6, 2018 teleconference that Respondent may request a credit from Petitioner for these costs." Respondent's Opening Br., at 18–19. It appears from Phillips' post-trial brief that he interpreted my guidance as permitting a request for credit for the entire amount of the Receiver's fees. However, the telephone conference focused on the Receiver's fees incurred after the valuation, and my guidance permitting Phillips to request a credit concerned those post-valuation fees incurred by the Receiver.

[87] JSOF, ¶ 30.

[88] *Id.* ¶ 15.

[89] *Id.* ¶ 17. Phillips agreed to the Joint Statement of Facts, which states, "[t]he Petitioner used the funds in the new bank accounts for legal fees and fees for Charles Sterner." *Id.* ¶ 17. In Phillips' post-trial briefing, however, he notes, "Petitioner also spent some of the money on an auto lease, Verizon wireless bills, and American Express bills." Respondent's Opening Br., at 7 n.3. The Respondent cites to JX 18, at 1, which is a bank statement from Wright's new accounts showing withdrawals for "Auto Lease," "VZ Wireless," "AMEX EPayment," and a check, totaling $1,336.99. JX 18, at 1.

6. <u>Phillips' Interim Payments</u>

As a result of a Motion for Sanctions from Wright, I ordered Phillips to make monthly payments to her in the amount of $12,500.[90] Phillips makes these payments on the fifth of each month.[91] As of December 31, 2019, Phillips had made interim payments in the amount of $200,000.[92]

*D. Procedural History*

Wright originally filed a Complaint and a Motion for a Temporary Restraining Order on September 23, 2015.[93] Phillips filed an answer with counterclaims on October 26, 2015.[94] After I denied the Temporary Restraining Order, the parties conferred and stipulated to the appointment of the Receiver on February 2, 2016 to assist with the deadlock of the Companies.[95]

On July 21, 2016, Wright filed a Motion for Order of Sale.[96] Phillips answered this motion on September 20 and filed a Cross Motion for Sale on September 22,

---

[90] Order for Interim Relief, D.I. 117.

[91] JSOF, ¶ 6.

[92] *Id.*

[93] Verified Compl. for Inj. and Other Relief, D.I. 1; Pet'r's Mot. for Temporary Restraining Order, D.I. 2.

[94] Resp't's Verified Answer and Countercl. to Verified Compl., D.I. 9.

[95] Stipulated Order for Appointment of Receiver, D.I. 25.

[96] Pet'r's Mot. for Order of Sale, D.I. 39.

2016.[97]  I held a hearing on November 22, 2016 regarding the cross motions for sale.[98]  Afterward Phillips elected to purchase Wright's share of the Companies.[99]  On May 25, 2017, I held an evidentiary hearing for the purpose of conducting a valuation.[100]  I issued a Letter Opinion on December 21, 2017.[101]

Wright filed a Motion for Sanctions against Phillips on April 10, 2018 for delays and complications related to payment.[102]  An Order for Interim Relief partially resolved these issues by requiring Phillips to pay $12,500 per month toward the purchase price of Wright's 50% share.[103]  Phillips' subsequent delay of the ordered payments resulted in an Order for Contempt.[104]

Around this same time, on October 26, 2018, Wright sought a final order of valuation.[105]  I held a second evidentiary hearing on May 1, 2019.[106]  Based on the parties' anticipated adjustments, I then held a one-day trial on November 18, 2019.[107]

---

[97] Resp't's Answer to Pet'r's Mot. for Order of Sale, D.I. 46; Resp't's Cross-Mot. for Sale, D.I. 47.

[98] D.I. 52.

[99] *Wright v. Phillips*, 2017 WL 6539383, at *1 (Del. Ch. Dec. 21, 2017).

[100] D.I. 73.

[101] Letter Op., D.I. 87.

[102] Pet'r's Mot. for Rule to Show Cause, D.I. 89.

[103] Order for Interim Relief, D.I. 117.

[104] Order for Contempt, D.I. 122.

[105] Pet'r's Mot. for Final Order of Valuation, D.I. 120.

[106] D.I. 133.

[107] D.I. 163.

After the parties completed post-trial briefing, with the parties' agreement, I considered the matter submitted without further argument.

## II. ANALYSIS

As noted, the parties differed on the scope of this final phase of litigation; Wright viewed it as an evidentiary hearing to facilitate accounting adjustments, while Phillips viewed it as a trial to support his original counterclaims for breach of fiduciary duty, breach of contract, and his equitable defense of unclean hands, all of which he argues he preserved prior to the 2017 valuation hearing.[108] Resulting from this disagreement, prior to trial, Wright filed a Motion *in Limine* seeking to exclude the key documentary evidence and (anticipated) testimony to be offered by Phillips.[109]

In his post-trial brief, Phillips stated, "[i]n the May 2017 Pre-Trial Stipulation, the parties agreed with the Court's approval to bifurcate this case into two stages— valuation and then personal claims."[110] This is a capacious reading of the 2017 pre-trial order, which mentions the counterclaims only once in passing.[111] Nonetheless,

---

[108] Tr. 65:20–77:2.

[109] Pet'r's Mot. *in Limine*, D.I. 159.

[110] Respondent's Answering Br., at 1.

[111] Pre-Trial Stipulation and Order dated May 22, 2017, D.I. 71, at 9–10 ("In addition, Respondent has counterclaimed for additional reductions that, if granted, would further reduce the amount to be received by Petitioner.").

at trial, I noted that the counterclaims were potentially preserved.[112] Because Phillips made Wright aware of his intended scope prior to trial, Wright was able to oppose the counterclaims through record evidence and cross-examination. Thus, I find there is no prejudice to Wright in addressing the counterclaims. In the interest of providing as complete relief as possible, I therefore address Phillips' counterclaims as briefed. I find that resolution of these claims, as well as the accounting adjustments, renders Wright's Motion *in Limine* moot.

### A. Phillips Counterclaims and Defenses

#### 1. Breach of Fiduciary Duty

Because Wright jointly owned the Companies and served as an officer, she owed fiduciary duties of loyalty and care.[113] To prove a breach of the duty of care, Phillips must show that Wright acted with gross negligence, meaning that she engaged in "conduct that constitutes reckless indifference or actions that are without

---

[112] *See* Tr. 73:6–11.

[113] Wright acknowledged her fiduciary duties in her original complaint in this matter. *See* Verified Compl. for Inj. and Other Relief, D.I. 1, ¶ 20 ("As a share holder, Petitioner and Respondent owe fiduciary duties to one another including duties of care and loyalty, and a general duty of good faith and fair dealing."). Wright served as Chief Financial Officer for the Companies. *Id.* ¶ 7. Also, as regards CK Aurora, Delaware's common law fiduciary duties apply to mangers and managing members of Delaware LLCs. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (citing 6 *Del. C.* § 18-1104; 6 *Del. C.* § 18-1101(c)). While an LLC may eliminate those common law duties in its operating agreement, provided that it does so clearly, the parties did not have an operating agreement for CK Aurora and so did not eliminate these duties. *See 6 Del. C.* § 18–1101(e); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009)

the bounds of reason."[114] To prove that Wright breached her duty of loyalty, Phillips must show that she put her own interests before those of the Companies or acted with bad faith, which means showing that she "knowingly and completely failed to undertake [her] responsibilities."[115]

Phillips argues that Wright breached her fiduciary duties in five ways: (1) using company funds to pay personal credit card bills; (2) "raiding" the offices to take files and equipment; (3) engaging in accounting practices that caused cash crunches, (4) failing to follow the Receiver's instructions, and (5) removing money to bank accounts that she independently controlled.[116] After reviewing the evidence and hearing the parties' testimony at trial, I find that none of Phillips' allegations against Wright rise to the level of a breach of her duty of care or loyalty. Phillips' evidence demonstrates that the parties have a toxic personal relationship; it does not demonstrate that Wright acted in self-interest or with gross negligence.

*First*, regarding Wright's personal credit cards, I find that Phillips has not proved that she in fact used company funds improperly. Phillips testified that he personally went through bank records and QuickBooks entries and assigned

---

[114] *See Zucker v. Hassell*, 2016 WL 7011351, at *7–8 (Del. Ch. Nov. 30, 2016), *aff'd*, 165 A.3d 288 (Del. 2017) (defining a breach of the duty of care as "having committed gross negligence.").

[115] *In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *11 (Del. Ch. March 19, 2018) (describing duty of loyalty); *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243–44 (Del. 2009) (describing bad faith).

[116] Respondent's Opening Br., at 10.

unrecognized credit card charges to Wright's personal use.[117] He offered examples of his method with a single page of QuickBooks entries.[118] Wright testified credibly why personal credit card charges appeared on the company accounts.[119] My analysis on this issue is described in more detail in the accounting adjustments, Section II.B.2, below, but I find there is insufficient evidence to find that this activity was wrongful or that it breached Wright's fiduciary duties.

*Second*, regarding the "weekend raids," I find that Wright's careless actions were directed at the disintegrated personal relationship between the parties. As Phillips testified, Wright came into the offices in 2015 and again in 2017 and took equipment and files, leading to long disputes between the parties about returning those items, and requiring intervention from the Receiver and this Court. Wright credibly testified that she had legitimate reasons for each of these actions related to work, and that, even if destructive, much of the "harm" was actually the result of Phillips' unwillingness to provide her the support she needed in her role at the Companies. Although Wright's behavior was less than admirable, I do not find that it was destructive in a manner that would rise to gross negligence or bad faith. In other words, to the extent Wright acted with scienter, it was her intent to irritate

---

[117] Tr. 90:18–94:24 (Phillips).

[118] *Id.* at 90:18–93:8 (Phillips); JX 16, at 15

[119] Tr. 205:2–10 (Wright).

Phillips, and not to hurt the business for which she was a fiduciary and of which she owned half.

*Third*, Phillips argues that Wright's accounting practices, including accelerating draws in a way that created a "cash crunch," violated Wright's fiduciary duties. Wright testified that it was Phillips' own deposit of business income in his accounts that caused the situation.[120] The Receiver himself recognized that Phillips' comingling of business and personal accounts was a problem.[121] Wright's actions put a heavy burden on Phillips to maintain operations, requiring the use of his personal funds.[122] But this issue, as with so many in this litigation, stems from the Receiver's observation that "[b]oth parties seem more interested in finding fault with the other than working together."[123] Wright's accounting choices were a part of the parties' infighting, and while perhaps careless of the Companies' bank account balance, do not contain the requisite scienter against the Companies to constitute a breach of fiduciary duty.

*Fourth*, Phillips focused strongly on Wright's dilatory work habits and her failure to follow the Receiver's instructions. The Receiver provided guidelines for

---

[120] *Id.* at 236:24–237:11 (Wright); *see also* JX 56.

[121] JX 6, Ex. 1, at 4.

[122] Tr. 49:6–51:2 (Phillips); JX 68, at 8 (bank statement showing operating account at just over $3,000).

[123] JX 11, at 1.

Wright's work at the businesses, including daily office hours. Phillips' secretary, Ms. Smith, unilaterally began keeping extensive daily records on an Excel spreadsheet documenting Wright's arrivals and departures at the office.[124] These records, which Wright did not disagree with, show that her presence at the office was decidedly part-time, when she was there at all.[125] In addition, Wright failed to follow other instructions from the Receiver, including returning money to company accounts and returning files and equipment. This behavior does not prove, however, that she acted with gross negligence or disloyalty to the Companies in her fiduciary role. There is no evidence of a disloyal intent to harm the Companies, or that she acted with reckless abandon. A failure to obey guidelines set by a Receiver is not a *per se* violation of fiduciary duties. Here, Wright testified credibly that she had logical reasons for her choices regarding work hours and location that included her safety and her long history of working from home.[126]

*Fifth*, and finally, Phillips argues Wright breached her fiduciary duties when she moved funds into new company accounts that she controlled. Phillips does not assert that she misappropriated these funds or removed them from the businesses

---

[124] Smith was not asked to do so by this Court or the Receiver. There appears to be tension between Smith and Wright. *See, e.g.*, Tr. 112:24–113:20 (Smith testifying that she arrived at work one day to find her office things on the lawn and her employment terminated by Wright, only to have her employment reinstated a few minutes later by Phillips).

[125] JX 29; JX 30.

[126] JSOF, ¶ 36–37; JX 33, at 1.

entirely. Wright testified that she moved the funds to ensure the Companies had money to pay for her legal and professional fees as agreed in light of the fact that Phillips had also started new bank accounts and was depositing revenues into those accounts.[127] It appears Wright had cognizable reasons to move the funds, and, as she points out, the Receiver's instruction to transfer them back was contingent on Phillips reinstating her salary, which he did not do.[128] As with Phillips' other allegations, Wright acted unwisely, and to an extent improperly, in furtherance of her personal dispute with Phillips, but Wright's actions do not rise to the level of a lack of care or loyalty in violation of her fiduciary duties.

### 2. Breach of Contract

Phillips argues that Wright breached a contract by failing to adhere to the guidelines in the Divorce Agreement. The elements of a breach of contract are (1) a valid contract, (2) a breach of that contractual agreement, and (3) resulting damages.[129] Phillips argues that the Divorce Agreement should be treated as a *de facto* operating agreement for the Companies and therefore a contract that Wright could breach. The Divorce Agreement permits the parties "to sue for damages for a

---

[127] JX 56.

[128] *See* JX 65.

[129] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

24

breach of this agreement or to enforce at law or in equity the same and seek such legal remedies as may be available."[130]

I find, however, that even if the Divorce Agreement is a personal contract between Wright and Phillips (rather than solely a court order, as Wright contends), and even if Wright breached it, Phillips has not proved resulting damages. Nor does he attempt to do so.[131] Instead, he relies on a theory of disgorgement. He argues: (1) under the Divorce Agreement, Wright agreed to accept fifty-percent responsibility for the operations of the Companies; (2) instead of undertaking her responsibilities as agreed, Wright violated her fiduciary duties and breached the "contract" by failing to work hard and vexing Phillips, to the detriment of operations; (3) therefore, she earned her salary and benefits "while acting wrongfully," subjecting her salary and benefits to disgorgement.[132] Phillips' argument misses the mark. Disgorgement prevents a defendant from keeping ill-gotten gains earned *through* or *by means of* wrongful acts.[133] It does not, as Phillip contends, justify the

---

[130] JX 1, ¶ 35.

[131] *See* Respondent's Opening Br., at 15 ("Respondent has not tried to articulate specific monetary damages to the Companies or himself. Rather, Respondent's theory of damages and relief against Petitioner is about what Petitioner gained while acting wrongfully."). The Receiver himself testified he did not believe the Companies suffered any damages under his watch. Tr. 143:10–21, 159:6–13 (Hastings).

[132] Respondent's Opening Br., at 14–15.

[133] *E.g. Triton Const. Co. v. Eastern Shore Elec. Servs.*, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009) ("Delaware law prohibits fiduciaries from profiting personally *from disloyal acts* that constitute fiduciary breaches") (emphasis added); *Pfeiffer v. Lord*, 989 A.2d 683, 699 (Del. Ch. 2010). To succeed on an argument for disgorgement, Phillips would need to show that Wright's

25

claw-back of earnings that a defendant received "while acting wrongfully."[134] Moreover, as described above, I do not find Wright's actions constituted a breach of her fiduciary duties.

Even if Phillips pursued a traditional contract remedy, his claim would fail for an additional reason. To find for Phillips, I would have to determine that Wright agreed that her salary and benefits were being paid *as consideration* for her promise to take fifty-percent responsibility for the Companies in the Divorce Agreement, and that she breached that promise. There is no evidence of such a promise. The Divorce Agreement states, "each party shall receive a salary equal to the salary of the other party . . . Each party shall also be equally responsible for the ongoing management and operation of the businesses."[135] This does not demonstrate a *quid pro quo*; equal salaries for equal responsibility. Her salary, to my mind, is more in line with a presumptive draw on her ownership share in the Companies. In other words, she earned her draw because she was a fifty-percent owner, not because she agreed to certain work hours or work responsibilities.

---

accounting work for the Companies—which is how she earned her salary and benefits—was itself somehow illegal or disloyal.

[134] Respondent's Opening Br., at 15.

[135] JX 1, ¶ 2(a).

Finally, I note that if I were to find that Wright had breached a contractual duty, I would need to determine if performance was excused, given the parties' conduct while at work together.

In sum, even if the Divorce Agreement properly constituted a contract between the parties that Wright breached, Phillips has failed to offer any theory of damages under which Wright's salary and benefits could properly become a setoff of the Valuation Price, as he requests.

### 3. Unclean Hands

Phillips argues that the Valuation Price should be reduced due to Wright's unclean hands.[136] The doctrine of unclean hands is inapplicable to adjust a legal valuation of an asset. Unclean hands is a defense to an equitable proceeding, which invokes the interest of the Court in its own reputation. Where a plaintiff in equity appears with unclean hands in the matter at bar, this Court will not lend to that turpitude the power of equity.[137] Unclean hands is not a valuation tool; moreover, I have not found Wright's actions breached duties in equity. Phillips reliance on the doctrine of unclean hands is misplaced.

---

[136] Respondent's Opening Br., at 13–14.

[137] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522–23 (Del. Ch. 1998).

*B. Accounting Adjustments to the Valuation*

In addition to Phillips' counterclaims, addressed above, both parties seek accounting adjustments to the Valuation Price. The burden is on the party seeking the adjustment to prove that the Valuation Price should be so adjusted.

### 1. Adjustment for Wright's Work History and Earnings

Phillips seeks to reduce the Valuation Price in the amount of salary and benefits Wright received from the Companies generally between the Divorce Agreement and the sale. Phillips' expert, Hall, calculates that Wright earned $818,244.74 in compensation from October 2013 to the end of 2017.[138] Phillips argues that due to Wright's behavior, her compensation should be viewed as "an early advancement on her buyout price" and thus "paying her twice would be unjust."[139] As detailed above, I found that Phillips did not prove his counterclaims for breach of fiduciary duty or breach of contract. I also find Wright's salary, rather than "earned" as a result of her efforts at the Companies, was in the way of a presumptive draw on her ownership share. As such, I find nothing "unjust" in her compensation up to the time of the sale. I therefore decline to adjust the Valuation Price based on Wright's work history and earnings.

---

[138] JX 16, at 1–2.

[139] Respondent's Answering Br., at 12.

28

## 2. Adjustment for Wright's Credit Card Bills

Phillips seeks to reduce the Valuation Price in the amount of the company funds he alleges Wright used to pay personal credit card bills. At trial, Phillips testified that Wright's illegitimate payments accumulated to "hundreds of thousands of dollars" and arose from, "like, 20 different credit cards that were not company credit cards."[140] He testified that he personally went through bank records and QuickBooks entries and assigned unrecognized credit card charges to Wright's personal use.[141] He offered a summary example of his method, pointing to a single page of QuickBooks entries and a catalog of bank records.[142] Nothing more specific was offered. Wright countered this summarily by testifying that the parties left personal credits cards at the office for drivers to use, and that both she and Phillips sometimes put business expenses on their personal credit cards.[143]

In contrast to his vague testimony at trial, in post-trial briefing, Phillips contends that his review of bank statements from August 2015 to March 2016 shows that Wright used the Companies' funds to pay personal credit card bills in the amount of $42,108.92.[144] For this statement, Phillips cites to his trial testimony as well as a

---

[140] Tr. 90:18–23, 94:21–24 (Phillips).

[141] *Id.* at 90:18–94:24 (Phillips).

[142] *Id.* at 90:18–93:8 (Phillips); JX 16, at 15; JX 68.

[143] Tr. 205:2–10 (Wright).

[144] Respondent's Opening Br., at 7.

collection of County Bank statements.[145]  Phillips then contends that Wright made entries in the Companies' QuickBooks showing payments of personal credit card bills in the amount of $46,426.07.[146]  To support this, he cites again to his trial testimony and the single page of QuickBooks entries he used as an example of how he made his calculations.[147]  It does not appear that Phillips had his expert or an accountant review his calculations or the supporting documents—certainly, there is no record evidence that his expert signed off on Phillips' calculations.

Phillips is the party seeking this adjustment and thus bears the burden of proof to demonstrate that it is more likely than not that improper use of company funds occurred, and the amount.  I find he has not done so.  Without further insight into Phillips' final figure of $88,534.99 (and not, as he testified, "hundreds of thousands of dollars"), I am left with an issue of proof.  I find it plausible—indeed, Wright seemed to affirm as much in her trial testimony—that the Companies may have paid some of Wright's personal credit card expenses.[148]  In fact, as with many small family-operated businesses, comingling of personal and business debt and assets was, unfortunately, not a concern of the principals—Phillips own actions in this

---

[145] *Id.* (citing Tr. 88:13–95:9 (Phillips); JX 68).

[146] *Id.*

[147] *Id.* (citing Tr. 88:13–95:9 (Phillips); JX 16, at 15).

[148] Tr. 205:2–10 (Wright) (testifying that both parties "also had credit cards that we used for more personal items but still ended up with some business items in there as well.").

30

regard are discussed, below. To make the adjustment in the amount that Phillips requests, however, I must have a basis in the record. Phillips urges me to find that (1) every charge from a credit card he did not recognize represented an improper personal charge by Wright, (2) those charges by Wright were entirely personal in nature, and (3) Phillips' calculations are accurate without the assistance of an accountant or expert, and without providing a full record of his calculations.

Weighing against this, Wright testified that personal credit cards showed up on the business accounts because they were sometimes used by drivers and by both parties for business expenses. I credit this testimony. While it conflicts with Phillips' testimony that he *never* paid personal credit cards with company funds, I find that representation unlikely, in view of his regular commingling of business and personal funds.[149] Additionally, Phillips' vague testimony at trial, that he could not "remember the specifics" but that the figure "was in the hundreds of thousands of dollars," and later that it was "well in excess" of $100,000, compared to the number after trial—$88,534.99, citing to his vague testimony, a page of QuickBooks entries, and bank statements—does not allow me to verify his calculations. It is plausible that Wright may have used company funds for some personal expenses, but Phillips has failed to prove that she did, and, if so, to what extent. Therefore, I decline to

---

[149] Such comingling is technically improper, but not uncommon in the scenario of a jointly-owned family business. I note it not to indicate that Phillips' actions were wrongful, but to explain why I question his testimony here.

adjust the Valuation Price for Phillips' allegations regarding Wright's personal credit cards.

### 3. Adjustment for the Movement of Funds to New Company Accounts

Phillips argues that the Valuation Price should be reduced for the funds Wright removed from the Companies' operating accounts into two new accounts controlled exclusively by her. The parties agree that Wright in fact removed $45,000 into new accounts.[150] The parties further agree that she spent this money on legal and professional fees for this litigation.[151]

Phillips appears to argue that the spent funds merit an adjustment because the Receiver instructed Wright to return them, and she did not.[152] Wright points out, however, that the Receiver made his instruction contingent on Phillips' restoring her suspended salary, which Phillips did not do.[153] I find the pertinent question to be how the funds were used. This makes resolution simple: the Receiver confirmed that the Companies would pay for both parties' litigation expenses.[154] Wright used

---

[150] Tr. 19:2–15 (Sterner), 238:16–239:2 (Wright); JX 56.

[151] Tr. 21:21–22:3 (Sterner), 242:21–243:7 (Wright). Phillips points out that she also used money from the account for an auto lease ("$579.40"), a Verizon Wireless bill ("$165.80"), an American Express bill ("$108.79"), and an unidentified check ("$483.00"). *See* JX 18, at 1. Phillips pointed to these expenses both at trial and in post-trial briefing but never indicated whether he thought they were inappropriate personal expenses or what he wished the Court to do with them. Respondent's Opening Br., at 7 n.3 (citing Tr. 19:16–20:16 (Sterner)).

[152] Respondent's Opening Br., at 7.

[153] *See* JX 65.

[154] *See* Tr. 243:1–7 (Wright), 96:7–17 (Phillips).

32

the funds for litigation expenses.  As such, they were company funds used for an ordinary business expense.  I therefore decline to adjust the Valuation Price based on the $45,000 Wright moved out of the operating accounts.[155]

### 4. Adjustment for the Parties' Joint Account

Phillips argues the Valuation Price should be reduced to account for Wright's disproportionately greater spending from the parties' personal "Joint Account."  In total, Phillips asserts that Wright benefited an additional $119,880 from the Joint Account.[156]  The parties agree, however, that their contributions to the Joint Account were equal.[157]  Wright does not dispute that she spent more of the Joint Account funds.  Instead, she argues that the Joint Account, a personal checking account, has nothing to do with the value of the Companies beyond the fact that each party contributed equally to it.[158]  Because I find that draws from the Joint Account were not a part of the business interest before me, I decline to adjust the valuation for such draws.

---

[155] I also decline to adjust for the $1,336.99 from these accounts that Phillips vaguely suggests—but never alleges—were improper.  *See* JX 18.

[156] Respondent's Opening Br., at 7–8.  Phillips also contends, based on the Receiver's report of August 10, 2016, that Wright received $36,801 in excess distributions, and he lumps this sum into discussions regarding the Joint Account for a total requested adjustment of $156,681.  *Id.*  I resolve the issue of the excess distributions separately below.

[157] JX 16, at 1.

[158] Petitioner's Opening Br., at 9–11.

Phillips makes three arguments regarding why the Joint Account is a proper subject for an accounting adjustment. None, to my mind, has merit.

*First*, Phillips claims the Joint Account "was funded by the Companies," and therefore it should be part of the valuation process.[159] He does not cite anything to support this statement. The parties stipulated that "[t]he 'joint account' was not a Company account."[160] Phillips seems to be pointing out merely that the parties contributed to the Joint Account through draws and paychecks from the Companies. Those contributions were equal.

*Second*, Phillips argues that this Court ordered the Receiver to review the Joint Account, and therefore Phillips' requested adjustment "draw[s] on the court-appointed Receiver's work."[161] Both Phillips and the Receiver appear to believe the Joint Account pertains to the valuation because the Court ordered the review.[162] But this does not properly construe the record. On April 4, 2016, the Receiver submitted a report stating that to resolve the "payroll issue," he required documentation on the Joint Account because "[s]ome of the payroll and distribution checks" were deposited in that account[163] On May 2, 2016, he confirmed this need: "The joint

---

[159] Respondent's Opening Br., at 7.

[160] JSOF, ¶ 31.

[161] Respondent's Answering Br., at 14.

[162] *See* Tr. 249:4–6 (Phillips), 137:23–138:6 (Hastings).

[163] JX 6, at 1.

account . . . goes to the heart of the payroll issue. While we have been able to determine that the payroll amounts have been equal . . . we have not been able to determine where they were deposited and what they were used for."[164] Based on these reports, I authorized review on May 24, 2016, stating that such review fell under "the broad authority granted to the Receiver to verify that business funds were only used for business purposes or were consistent with the [Divorce Agreement] . . ."[165] Therefore, to my reading of the Receiver's reports and this Court's Order, the purpose of the Receiver's review of the Joint Account records was to resolve the payroll issue. The fact that the Receiver chose to conduct a broad review analyzing all contributions and expenditures does not make the expenditures a valuation issue. It is difficult to conceive—given the parties' equal contributions from the Companies to the Joint Account—how an imbalance of *spending* from that personal checking account affects the value of the Companies. Nothing in the record indicates that the law of the case is otherwise.

*Third*, Phillips argues that Wright's use of the Joint Account violated the Divorce Agreement, which required "prior agreement of the other party" to use the funds in that account.[166] But nothing in the Divorce Agreement connects the Joint

---

[164] JX 7, at 1.

[165] JX 3, at 1.

[166] *See* JX 1, ¶ 13.

Account to the Companies or suggests that the Joint Account should be viewed as a business account or business asset. Even if I credited Phillips' argument that the Divorce Agreement is a *de facto* corporate document, it would be unreasonable to construe *everything* in the Divorce Agreement as somehow connected to the Companies. The Divorce Agreement addresses the Companies in one cabined section with its own subheading; the Joint Account, like other personal assets, is dealt with elsewhere, in a section regarding the parties' personal financial accounts.[167] Disputes over whether spending from this personal checking account complied with certain non-business requirements of the Divorce Agreement is a personal issue between the parties and does not affect the Valuation Price.

In addition to excess spending in the amount of $119,880, Phillips also relies on the Receiver's report for his argument that the Valuation Price should be reduced for excess "distributions" in the amount of $36,801.[168] This is based on the Receiver's statement that "[i]n addition, we have analyzed the distributions for 2014 and 2015 for Data Guard Recycling, Inc., Data Guard, Inc. and CK Aurora, Inc. . . . for the two year period Mrs. Wright's distributions exceed [Phillips'] by $36,801."[169] Phillips examined the Receiver on this figure at trial and lumps the amount into the

---

[167] *See id.* ¶¶ 2, 13.

[168] Respondent's Opening Br., at 8.

[169] Ex. 10, at 2.

request for an adjustment related to the Joint Account.[170] Confusingly, Phillips never clarifies how these "distributions" are related to the Joint Account and how they differ from "contributions," which the parties agree were equal.[171] Phillips has not met his burden of proof on this adjustment. Accordingly, I decline to adjust the Valuation Price for issues regarding the Joint Account or the Receiver's calculation of excess distributions.

### 5. Adjustment for Phillips' Use of His Personal Bank Account for Business Purposes

Wright argues that the Valuation Price should be increased for business income that she alleges Phillips deposited in his personal account and never returned to the Companies.[172] To support her claim, Wright's expert, Sterner, reviewed checks, bank statements, and deposit tickets associated with Phillips' personal bank

---

[170] Tr. 141:24–142:6 (Hastings); Respondent's Opening Br., at 8.

[171] Upon review of the Receiver's report and the exhibits included therein, it appears that the Receiver was calculating distributions that went directly to the parties, unrelated to the Joint Account. *See* JX 10, Exs. B, L, M. Thus, it appears that this part of the Receiver's report is duplicative of the analysis conducted by Phillips' expert, Hall, regarding "salary and draws." *See* JX 16, at 1–2. I examine this adjustment request, and deny it, for reasons stated *infra*. Just as confusing, Phillips examined Hall extensively about his findings regarding "salary and draws" and his conclusion that Wright received $17,655.56 more than Phillips, but he did not address this figure at all in his post-trial briefing. Tr. 165:13–173:2 (Hall). Meanwhile, having asked the Receiver a single question regarding the "distributions," Phillips lumped a request for adjustment in with the Joint Account figure, without explanation. 141:24–142:6 (Hastings); Respondent's Opening Br., at 7–8. If Phillips is submitting the requested adjustment of $36,801 in excess "distributions" as part of the Joint Account, I find that it is not related to the business and no adjustment is appropriate, as explained above. If he is submitting it to substitute for Hall's lower finding of excess distributions, I find this prejudicial to Wright, who was not alerted to such a request prior to trial and thus had no opportunity to have her expert properly respond.

[172] Petitioner's Opening Br., at 2.

accounts and categorized deposits and expenditures based on the item descriptions and his experience with the Companies into "business" and "personal" categories.[173] He reviewed the items based on their facial descriptions and did not inquire with Phillips or the recipients of the payments to confirm whether they were business or personal expenses.[174] Using these methods, Sterner concluded that Phillips had retained an excess of $35,545.61 in his personal accounts.[175]

Phillips' expert, Hall, did not respond to Sterner's report or his testimony. Phillips himself testified at trial that he believed the discrepancies were caused by "one-offs" where he provided customers with services outside of the ordinary scope of the business; thus, according to his testimony, expenses that appeared facially to be personal were in fact business expenses.[176]

I found Sterner's method adequate and his testimony and supporting evidence credible. Other than Phillips' testimony that one-off customer projects could have accounted for the discrepancies, his report went unrebutted. At trial, Phillips' counsel sought to undermine Sterner's report by pointing out that he had not verified the source of funds with the third parties sending the payments or Phillips himself to

---

[173] JX 15, at 1–3.

[174] Tr. 17:16–18:11 (Sterner).

[175] Originally, Sterner opined that Phillips had wrongfully retained $38,545.61, but review of Hall's report alerted him to the fact that he had erroneously "double-booked" $3,000 to Phillips. Tr. 20:18–21:7 (Sterner).

[176] Tr. 250:21–253:1 (Phillips).

confirm their business or personal nature.[177]  To my mind, this is not a sufficient rebuttal.  Sterner provided the detailed records that he reviewed; he testified that he based his review on his historical knowledge of the Companies; he reviewed Hall's report to verify his findings; and he reconciled his report to Hall's findings by correcting errors.[178]  I therefore find that the Valuation Price should be increased by $35,545.61 to account for business funds deposited in Phillips' personal accounts and not returned to the Companies.

### 6. Adjustment for the Costs of the Receiver and Legal Fees Paid by the Companies

Phillips argues that the buyout price should be reduced in the amount of half the costs of the Receiver and for any legal fees paid by the Companies on Wright's behalf.  I have already resolved the issue of legal and professional fees, which I found to be ordinary business expenses.  Additionally, the parties agreed that the Receiver's fees would be paid by the Companies.[179]  The Receiver was appointed for the benefit of the Companies after I found that the owners were effectively deadlocked.[180]  Therefore, I find that the expenses and benefits generated by the

---

[177] *Id.* at 17:18–18:11 (Sterner).

[178] *Id.* at 6:4–13:3 (Sterner).  I find the evidence here stands in contrast to Phillips' request for an adjustment based on Wright's use of personal credit cards, where the evidence was simply inadequate.  Here, Wright had an expert conduct the review and submit a report explaining his methods and conclusion, both of which were consistent with his trial testimony.

[179] JX 2, at 3–4.

[180] *See id.*

Receiver while the parties remained co-owners were properly born by the Companies as an ordinary business expense that rolled into the valuation.

Alternatively, Phillips argues that the buyout price should be reduced for half of the Receiver's fees incurred *after* the sale in 2017. This argument has more merit. After the sale occurred, the Receiver continued to provide services, which the Companies paid, but which were not accounted for in the valuation. I noted at a hearing that Phillips could seek to have the post-valuation Receiver's fees "applied as a court cost at the final resolution" of the litigation.[181] Wright argues that the Receiver's fees, after the Valuation, were accrued almost entirely to enforce Phillips' compliance with this Court's orders. I find, however, that the Receiver's post-valuation efforts were aimed at brokering the parties' differences, and thus benefited both parties. As sole owner, Phillips bore these post-valuation Receiver costs alone. Phillips states the Receiver's costs, post-valuation, totaled $23,500, and requests an adjustment of $11,750.[182] Wright does not dispute this amount. Therefore, I find the Valuation Price should be reduced by $11,750.

---

[181] *See* Teleconference on Application for Payment of Receiver's Fees, D.I. 127. As noted in the Background section, Phillips interpreted my guidance as permitting a request for credit for the entire amount of the Receiver's fees, but the scope of the request was limited at the hearing to post-valuation fees.

[182] Respondent's Opening Br., at 19.

## 7. Adjustment for Phillips' Interim Payments

Phillips requests a reduction of the Valuation Price to account for his monthly court-ordered payments to Wright. Wright does not dispute this reduction. As of December 31, 2019, Phillips had made interim payments in the amount of $200,000.[183] He pays $12,500 on the fifth of each month.[184] Therefore, as of the date of this Memorandum Opinion, he has paid $262,500 in interim payments. Therefore, the Valuation Price should be reduced by $262,500.

## 8. Additional Adjustments

Finally, Hall found in his expert report and testified at trial that Wright received salary and draws in excess of Phillips in the amount of $17,655.56.[185] Phillips did not address this purported excess in his post-trial briefing or include it in his summary of requested adjustments.[186] This arguably waives the requested adjustment, but even if it did not, Hall's cross-examination demonstrated several items he had not attributed correctly that would erase the purported excess in Wright's favor.[187]

---

[183] JSOF, ¶ 6.

[184] *Id.*

[185] JX 16, at 2.

[186] *See* Respondent's Opening Br., at 20.

[187] Tr. 173:10–180:12 (Hall).

Wright, however, goes further: based on Hall's cross-examination and her own testimony, she appears to request an adjustment of the Valuation Price *upward* by an additional $49,841.74.[188]  Wright did not request this adjustment in the joint pre-trial stipulation.  Even in her post-trial briefing, she does not expressly assert the request; rather, she suggests that if I find her testimony credible and discredit Hall's report, it would skew his results in her favor.[189]  I find that this request for an adjustment—if it is a request—was improperly raised for the first time at trial and in post-trial briefing, without giving Phillips a proper chance to respond.[190]  Therefore, no adjustment to the Valuation Price is warranted based on Wright's "rebuttal" of Hall's report.

## III. CONCLUSION

Phillip's counterclaims for breach of fiduciary duty and breach of contract are denied, and his attempt to invoke unclean hands is misplaced.  The Valuation Price of $1,098,001.50 is adjusted as follows:

1. The Valuation Price is increased by $35,545.61 to account for business funds that remain in Phillips' personal accounts;
2. The Valuation Price is decreased by $11,750 to account for costs of the Receiver incurred by the Companies after the valuation;

---

[188] Petitioner's Opening Br., at 4–5, 12.

[189] *Id.* at 5 ("At the very least, the Hall report should be disregarded . . . If the Court accepts Ms. Wright's testimony as to the items factoring into the Hall report (most of which Hall admitted were in error), the effect is that Mr. Phillips was paid $49,841.74 more than Petitioner.").

[190] I suggested as much at trial.  *See* Tr. 217:23–219:4.

3. The Valuation Price is decreased by $262,500 to account for interim payments made by Phillips.

These adjustments result in an adjusted and final valuation of Wright's ownership interest in the Companies of $859,297.11. The parties should confer and submit an appropriate form of order.